UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Jerome B. Simandle, C.U.S.D.J. |
| | : | |
| v. | : | |
| | : | |
| TOYE TUTIS | : | Crim. No. 14-699 (JBS) |

_____

GOVERNMENT'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT'S
MOTION TO WITHDRAW PLEA AND FOR A RULING ON THE LUIS MOTION
_____



WILLIAM E. FITZPATRICK
Acting United States Attorney
Federal Building and U.S. Courthouse
401 Market Street, Fourth Floor
Camden, NJ 08101
(856) 757-5026


On the Brief:

Howard Wiener
Diana Vondra Carrig
Jonathan Peck
Assistant U.S. Attorneys

## I.     SUMMARY OF DEFENDANT'S MOTIONS

Defendant pled guilty on November 1, 2016 to Counts 1 (drug-trafficking conspiracy) and 13 (money laundering conspiracy) of the Second Superseding Indictment (hereinafter "indictment").  In late January 2017, a federal jury sitting in the District of Maryland convicted his attorney, J. Michael Farrell ("Farrell"), of numerous federal crimes.  Shortly thereafter, this Court disqualified Farrell from further representation of defendant and appointed Stanley King, Esquire to replace Farrell as defendant's counsel.  On March 15, 2017, counsel filed a motion to withdraw defendant's guilty plea, along with a request for the Court to decide a pretrial motion pending at the time he entered a plea of guilty.  That motion has been referred to by all parties as "the Luis motion."  See ECF Document 322, at 49-59.  In that motion, defendant had requested that the Court release certain assets the Government had moved to forfeit so he could have funds available to pay Farrell.  The current motion modifies the Luis motion in that it now seeks the release of certain assets so that defendant can retain private counsel in the parallel New Jersey prosecution of defendant.

The Government now responds to both the motion to withdraw the plea and the request for a ruling on the Luis motion.

### The Plea Negotiations in the Week Before the
### November 1, 2016 Rule 11 Proceedings

Following the Court's ruling on October 21, 2016 on the key wiretap suppression motion, see ECF Document 388, the parties resumed plea negotiations.  On October 27, 2016, after extensive discussions among counsel for the Government and defendants Toye Tutis and Jazmin Vega, the Government drafted and sent by email

proposed plea agreements to both counsel together.  A copy of the transmitting email, together with two of its attachments—the October 27, 2016 proposed plea agreements for Tutis and Vega—are attached hereto as Exhibits 1 (the email), 2 (the Tutis plea agreement), and 3 (the Vega plea agreement).

These plea agreements were interlocking or coupled, meaning that each was contingent upon the codefendant (a) executing his/her plea agreement, and (b) entering a guilty plea pursuant to that plea agreement.  The language coupling the two plea agreements was in the very first paragraph of each plea agreement.[1]

On Friday, October 28, 2016, while counsel for Vega advised the Government that Vega would sign the proposed plea agreement,[2] Farrell advised the Government that Tutis would not accept the proposed plea agreement.  All counsel and the Court had an off the record discussion on that date, during which Farrell advised counsel for the Government that Tutis instead wanted either a conditional plea agreement, which would allow him to appeal certain legal issues, or a stipulated trial.

---

[1] There was a typographical error in the Tutis plea agreement in the first paragraph.  The relevant language states that the Tutis agreement was "contingent upon the execution of a plea agreement dated October 27, 2016 by co-defendant Toye Tutis, and the entry of her guilty plea pursuant to that agreement."  See Exh. 2 at 1.  Obviously, this sentence should have referred to co-defendant Jazmin Vega, not Tutis.  The intent to couple the plea agreements, though, also is obvious; the language in the Vega agreement (which was correct) parallels the language in the Tutis agreement.  See Exh. 3 at 1.

[2] On or about October 17, 2016, the Court conducted a Frye hearing for Vega, during which Vega stated in substance that she was desperate to plead guilty.  When the Government ultimately decided to decouple the plea agreements on or about October 31, 2016, the Government had explicit conversations with counsel for both defendants and explained that the Government would agree not to argue for more than a 78 month sentence for Vega, which was an increase from an earlier offer not to argue for more than a 60 month sentence.

Subsequently, the Government renewed plea negotiations with Farrell and over the ensuing weekend, the Government discussed both alternatives with Farrell.  See Tutis Oct. 31, 2016 Tr. at 3-5 (comments of Farrell).  Attorneys for the Government began drafting proposed stipulations for a stipulated trial and sent them to Farrell. Farrell discussed the plea negotiations with Tutis over that weekend.  On Monday afternoon, October 31, 2016, the Court conducted a hearing with both defendants and all counsel present.  Among other things, there was a discussion of how the parties would conduct a stipulated trial.  See Tutis Oct. 31, 2016 Tr. at 8.  The Government also advised those present that its deadline for consummating plea negotiations was the end of that day.  Id. at 10.

At or about the time of that hearing, Farrell requested that the Government draft and tender a conditional plea agreement for his client.  After the prosecutors requested and received supervisory approval, the Government agreed to draft such an agreement. **By this point, at the request of counsel for Vega, and in fairness to her—because the plea negotiations between the Government and Tutis had broken down—the Government had decided to decouple the two plea negotiations/agreements, and they were never coupled again.  Both counsel were advised of the decoupling of the pleas.**

An Assistant U.S. Attorney emailed a conditional plea agreement dated October 31, 2016 to Farrell at 8:28 p.m.; a copy of that agreement is attached hereto as Exhibit 4.  Because of the lateness of the hour (and the Government's previous declaration that if the parties did not reach a deal on October 31, 2016, then plea negotiations would end), the Government granted Farrell's request to extend the deadline for the execution

3

of that plea agreement to 11:00 a.m. on Tuesday, November 1, 2016.  That plea
agreement was not coupled with any other plea agreement; there is no language in the
first paragraph or anywhere else in that agreement concerning coupling.  The
Government similarly provided a revised plea agreement also dated October 31, 2016
to counsel for Vega; a copy is attached hereto as Exhibit 5.  That plea agreement
likewise was not coupled with any other plea agreement; there is no language in the first
paragraph or anywhere else in that agreement concerning coupling.  Therefore, both
attorneys and their clients knew on Monday, the day before they pled guilty, that the
latest plea offers were not interlocking.[3]

The next day, Tuesday, November 1, 2016, Farrell and Tutis missed the 11:00
a.m. deadline and during a meeting a few minutes after that deadline with the
prosecutors, Farrell requested additional changes to the October 31, 2016 plea
agreement.  The Government refused and plea bargaining seemingly collapsed.  The
Government began preparing anew for trial, but within the hour Farrell contacted the
prosecutors and said that Tutis had changed his mind and signed the plea agreement.
The Government immediately advised the Court of this development and requested that
the Court schedule the Rule 11 proceedings for that afternoon.

As the October 31, 2016 Tutis plea agreement had expired by that time, the
Government modified that agreement by changing the date to November 1, 2016,
changing the deadline, and deleting the word "DRAFT" from each page, but otherwise

---

[3] On the afternoon of October 31, 2016, during a hearing before the Court, Farrell did make the statement
"these are tied pleas."  Tutis Oct. 31, 2016 Tr. at 6.  It is not clear whether by that point the Government
had agreed to decouple the plea agreements, see Exhs. 4 & 5 (October 31 plea agreements), but Farrell
was correct that at various times during October 27 through November 1, 2016, the Government was
simultaneously negotiating with both counsel.

the agreement, Exh. 6 (ECF Document 398), was identical to the one presented to Farrell and Tutis the day before.  <u>See</u> Exh. 4.[4]  Vega was present throughout Tutis's Rule 11 proceeding.  At no time during that proceeding did anyone—Farrell, Tutis, Vega, her attorney, the Government, or the Court—raise the issue of interlocking plea agreements.  After the parties made modifications to the Tutis plea agreement during his Rule 11 proceeding, the Court marked the final plea agreement Exhibit C-1 and filed it.  <u>See</u> Exh. 6 (ECF Document 398).

At the conclusion of that proceeding, the U.S. Marshal took Tutis back to jail and the Court then conducted the Rule 11 proceeding for Vega.  At no time during her Rule 11 proceeding did anyone—Vega, her attorney, the Government, or the Court—raise the issue of interlocking plea agreements.

## II. <u>ARGUMENT</u>

### A.  THE LAW GOVERNING WITHDRAWAL OF A GUILTY PLEA.

The Federal Rules of Criminal Procedure state, in relevant part, that:

A defendant may withdraw a plea of guilty . . .

(1) before the court accepts the plea, for any reason or no reason; or
(2) after the court accepts the plea, but before it imposes sentence if:

         *               *            *

(B)   the defendant can show a fair and just reason for requesting the withdrawal.

Fed. R. Crim. P. 11(d).

---

[4] On November 1, 2017, the Government modified Vega's plea agreement to conform it with the final Tutis plea agreement.  In particular, it was not interlocking with the final Tutis agreement.  During the Vega Rule 11 proceeding, the parties further modified it; the Court marked it Exhibit C-2 and filed it.  <u>See</u> Exhibit 7 (ECF Document 401).

The Third Circuit has stated that "[o]nce a court accepts a defendant's guilty plea, the defendant is not entitled to withdraw that plea simply at his whim." United States v. Jones, 336 F.3d 245, 252 (3d Cir. 2003). Indeed, the defendant bears a "substantial" burden in demonstrating the "fair and just reason" for withdrawal. United States v. Siddons, 660 F.3d 699, 703 (3d Cir. 2011).[5] There are compelling public policy interests for placing a substantial burden upon defendants seeking to withdraw their guilty pleas. The "withdrawal of a guilty plea is inherently in derogation of the public interest in finality and the orderly administration of justice." United States v. Horne, 987 F.2d 833, 837 (D.C. Cir. 1993). The Third Circuit, similarly, has recognized that "[a] shift in defense tactics, a change of mind, or the fear of punishment are not adequate reasons to impose on the government the expense, difficulty, and risk of trying a defendant who has already acknowledged his guilt by pleading guilty." Siddons, 660 F.3d at 703 (quoting Jones).

In order to assess whether defendant has carried his "substantial" burden, the Court "must consider whether: (1) he asserts his innocence; (2) he has proffered strong reasons justifying the withdrawal; and (3) the government would be prejudiced by the withdrawal." Id. (internal citations and quotation marks omitted). Furthermore,

---

[5] Tutis cites United States v. Young, 424 F.2d 1276, 1279 (3d Cir. 1970) for the proposition that, the withdrawal of a guilty plea prior to sentencing should be "freely allowed." The Third Circuit decided Young, however, when Federal Rule of Criminal Procedure 32(d) contained a provision concerning the withdrawal of a guilty plea; a different Rule—Rule 11—now governs this situation. At that time, and unlike the current Rule 11, Rule 32 did not "articulate a standard governing the withdrawal of a plea on a motion before sentence." Young, 424 F.2d at 1279. The "freely allowed" language in Young has not been cited in a precedential opinion of the Third Circuit since 1980, see United States v. Herrold, 635 F.2d 213, 215 (3d Cir. 1980), likely because the 1983 amendments to the Federal Rules of Criminal Procedure introduced a new standard for evaluating pre-sentence withdrawal motions. See United States v. Alvarez-Quiroga, 901 F.2d 1433, 1436 (7th Cir. 1990) ("Since the 1983 amendment to Rule 32(d), the Third Circuit has applied a more stringent standard of review."). As a result, the Government submits that the Court should not rely on Young, but instead should follow more recent case law like Siddons.

"[a]ssertions of innocence must be buttressed by facts in the record that support a claimed defense," and a "defendant must also give sufficient reasons to explain why contradictory positions were taken before the district court." Id. (internal citations and quotation marks omitted).

Finally, the Court should not lightly set aside defendant's previously sworn admissions of guilt in favor of his more recent unsworn and unsupported recantations. See Tutis Rule 11 Tr. at 17 (before Tutis said a word during his Rule 11 proceeding, he was sworn and advised of its consequences). Because many defendants seem to be under the misapprehension that a guilty plea is just provisional, and that an oath to tell the truth means nothing, let us be clear. A district judge might permit a defendant to withdraw his plea if the judge finds his reasons for lying under oath convincing and where there is no prejudice to the government. But as the Seventh Circuit has noted:

> because the district judge possesses considerable discretion in this regard, . . . a defendant has no chance of success on appeal when the judge elects to treat freely given sworn statements as conclusive. Entry of a plea is not some empty ceremony, and statements made to a federal judge in open court are not trifles that defendants may elect to disregard. A defendant has no legal entitlement to benefit by contradicting himself under oath.

United States v. Stewart, 198 F.3d 984, 987 (7th Cir. 1999) (internal citations omitted).

For the reasons set forth below, Tutis's motion to withdraw should be denied.

## B. DEFENDANT'S MOTION TO WITHDRAW HIS PLEA IS WITHOUT MERIT AND SHOULD BE DENIED.

Defendant makes a number of factual claims in his motion to withdraw that are contradicted by (a) the facts and circumstances of the plea negotiations; (b) his sworn

statements and the statements of others during his Rule 11 proceeding; and (c) the other evidence in this case.

At the outset, it should be noted that there is a fundamental contradiction in Tutis's argument.  He claims that "he only accepted the plea because he was under a tremendous amount of pressure and stress to minimize his wife's sentence. . . . [because] the Government would not accept his wife's plea unless and until [he] pled guilty."  Def. Motion at 4.  Yet in another breath, he says "he would not have entered into the particular plea agreement if [it] were not tied to his wife's agreement."  Id. at 2.  Thus, on the one hand, the "package deal" aspect of the plea negotiations was coercive, but on the other hand he was "clear," see id., that the "package deal" was a condition precedent to his entering a plea.

He therefore asks this Court to believe that, despite his claim of innocence, he was willing to accept a plea offer requiring him to spend many years in prison (at least 15) just so his wife would be able to plead guilty.[6]  That is, to put it mildly, ridiculous.[7]  Tutis's final plea agreement contained no requirement that Vega also plead guilty.  Indeed, when he rejected the October 27, 2016 interlocking plea agreement, Farrell advised the Government—and the Court and counsel for Vega, during the October 28,

---

[6] The Court made it clear to Tutis that it could not accept his guilty plea unless it determined "that the facts are there that actually make [him] guilty."  Tutis Rule 11 Tr. at 33.  Tutis also executed, with Farrell's help, a Rule 11 Application for Permission to Enter Plea of Guilty.  See ECF Document 397, attached hereto as Exhibit 8.  On page 6, at ¶ 43, Tutis declared under penalty of perjury that he knew that "the judge [would] not permit anyone to plead GUILTY who claims to be innocent, and with that in mind and because I am GUILTY, I respectfully request that the Court accept my plea of GUILTY . . . ."

[7] Tutis also claims that "[t]he Government also threatened that additional charges would be brought against Ms. Vega if Mr. Tutis did not accept this agreement."  Def. Motion at 4.  Defendant has supplied no proof whatsoever of this assertion.  That is because it is false.  Vega's plea occurred on the eve of trial, when no further charges could have been filed.

2016 off the record conference—that Tutis's priority was to preserve his right to appeal the denial of the suppression motion, either through a conditional plea, if possible, or a stipulated trial.[8]

 1.   **Defendant's Bare Assertion of Innocence is
      <u>Contradicted by His Sworn Statements in the Record.</u>**

 **a. Tutis's Claim of Innocence is Unsupported.**

The first prong of the three-part test in <u>United States v. Siddons</u>  is whether defendant has asserted his innocence in his motion.

 "Assertions of innocence must be buttressed by facts in the record that support a claimed defense," and a defendant must "sufficiently explain the contradictory position he took during the plea colloquy."  <u>Siddons</u>, 660 F.3d at 703 (internal citations and quotation marks omitted).  There are no such facts in the record, much less a claimed defense.[9]  A defendant must offer more than a "bald assertion of innocence," <u>United States v. Wilson</u>, 429 F.3d 455, 458 (3d Cir. 2005), to merit a withdrawal of a "solemn admission" of guilt.  <u>United States v. Isaac</u>, 141 F.3d 477, at 485 (3d Cir. 1998).  "[T]he good faith, credibility and weight of a defendant's assertions in support of a motion [to withdraw a guilty plea] are preeminently issues for the hearing court to decide." <u>Government of Virgin Islands v. Berry</u>, 631 F.2d 214, 220 (3d Cir. 1980) (internal quotations omitted).

---

[8] During negotiations, Farrell also stated that Tutis's priority was to minimize the forfeiture of his property as much as possible.

[9] The only defense the Government could ever discern was Tutis's efforts to suppress the wiretaps.  The defense motions are largely bereft of factual claims, other than that Tutis was not "Santana."

Here, the only thing Defendant says in his motion about innocence is that he "continues to maintain his innocence as to the charges brought against him." Def. Motion at 2. Yet, when the Court asked Tutis during his Rule 11 proceeding if he was guilty, he said yes. Tutis Rule 11 Tr. at 35 (as to Count 1); 38-39 (as to Count 13). Tutis has not attached to his motion any affidavits, exhibits, or evidence of any kind to support any of his claims, much less his claim of innocence.[10] Thus, Tutis fails the first prong.

### b. Defendant's Sworn Statements During His Rule 11 Proceeding Contradict His Claim of Innocence.

As argued below, there is ample proof that Tutis's statements during his Rule 11 proceeding were made voluntarily. See Part II.C.3. infra. Therefore, there is no reason for the Court to ignore Tutis's admissions of guilt at that proceeding, which were extensive:

| | |
|---|---|
| The Court: | First, have you carefully read the charges against you in the Second Superseding Indictment? |
| Tutis: | Yes. |
| The Court: | Have you carefully gone over the Second Superseding Indictment with Mr. Farrell? |
| Tutis: | Yes. |
| The Court: | Do you understand the charge against you in Count One charging conspiracy to possess with intent to distribute the drugs? |
| Tutis: | Yes. |
| The Court: | And are you guilty of the offense charged in Count One? |
| Tutis: | Yes. |
| The Court: | Do you also understand the offense that is charged in Count Thirteen charging you with money laundering? |
| Tutis: | Yes. |
| The Court: | Have you read that carefully and gone over it with Mr. Farell? |
| Tutis: | Yes. |
| The Court: | And do you understand the charge? |
| Tutis: | Yes. |

---

[10] Not only is there no affidavit from Tutis, there is none from Farrell (or from Vega or her attorney) averring that the final plea agreement contained a "package deal."

The Court:     Are you guilty of the offense charged in Count Thirteen?

Tutis:         Yes.

The Court:     During the time period from February of 2012 through on or about December 10, 2014, in Atlantic County and elsewhere, did you agree with Ivan Cuellar-Naranjo, Phillip Horton, Kareem Taylor, and others to distribute cocaine and heroin in the southern New Jersey and Philadelphia areas?

Tutis:         Yes.

The Court:     Did you know that such an agreement violated federal narcotics laws?

Tutis:         Yes.

The Court:     Pursuant to that agreement, did you purchase and distribute kilogram quantities of cocaine and heroin?

Tutis:         Yes.

The Court:     Do you agree that the conspiracy involved between 150 to 450 kilograms of cocaine and approximately 26 kilograms of heroin?

Tutis:         Yes.

The Court:     Did you do all of these things knowingly, that is intentionally?

Tutis:         Yes.

The Court:     And did you do them voluntarily and not by mistake?

Tutis:         Yes.

The Court:     And are you guilty of the drug trafficking conspiracy charged in Count One of the Indictment?

Tutis:         Yes.

The Court:     At some point prior to February 2012 and continuing to on or about December 10, 2014, in Atlantic County, New Jersey, did you knowingly and intentionally agree to join together with Jazmin Vega to engage in money laundering?

Tutis:         Yes.

The Court:     Subsequently did you and/or Jazmin Vega on numerous occasion travel to TD Bank branches in the Atlantic City, New Jersey area and conduct financial transactions at those financial institutions with funds that were the proceeds of drug trafficking?

Tutis:         Yes.

The Court:     Specifically, did those financial transactions involve you and/or Jazmin Vega bringing U.S. Currency to the bank in denominations of $20 bills and exchanging that currency for $100 bills?

Tutis:         Yes.

The Court:     Did you and/or Jazmin Vega sometimes also receive $50 bills during those exchanges?

Tutis:         Yes.

                     *                    *                    *

The Court:     Did you agree to package up these large denomination bills on multiple occasions and ship them to the Los Angeles, California area via UPS and other delivery services?

Tutis:         Yes.

11

| The Court: | Did you and Jazmin Vega agree to ship that cash for the purpose of enabling you and others to purchase illegal drugs, specifically cocaine and heroin? |
| Tutis: | I did, not Jazmin. |
| The Court: | Okay.  Okay, so the question would be did you agree to ship that cash for the purpose of enabling you and others to purchase illegal drugs, specifically cocaine and heroin? |
| Tutis: | Yes. |
| The Court: | Was your purpose in exchanging small denominations for large denomination bills to reduce the weight and size of those shipments of cash so as to lessen the chances of detection by law enforcement? |
| Tutis: | No. |
| The Court: | No? |
| Tutis: | No. |
| The Court: | What was your purpose in making those exchanges? |
| Tutis: | Sometimes I sent [$]20s, too. |
| The Court: | Pardon? |
| Tutis: | It didn't make a difference. |
| The Court: | Okay.  And did you and/or Jazmin Vega also deposit various sums of U.S. Currency into both TD Bank and Bank of America? |
| Tutis: | Yes. |
| The Court: | Did you know at some point prior to February of 2012 that if you conducted a transaction with a financial institution involving more than $10,000 in U.S. currency, that is, cash, or two or more related transactions totaling more than $10,000 in a 24-hour period, that the financial institution was required to report that transaction or transactions to the federal government? |
| Tutis: | Yes. |
| The Court: | As a result of your knowledge of that reporting requirement, did you and Jazmin Vega agree to structure your cash and other transactions with TD Bank and Bank of America to avoid the filing by those banks of reports to the federal government detailing your cash and other transactions? |
| Tutis: | Just the cash transactions, not other transactions.  Because I deposited 80, $90,000 checks on a weekly basis almost.  So just on the cash, yes. |
| The Court: | On the cash? |
| Tutis: | Yes. |
| The Court: | Very well.  And specifically, did you and Jazmin Vega agree that you and/or her would often travel to more than one branch bank on the same date and structure your cash transactions so that you and/or her did not conduct a cash transaction exceeding $10,000 at any one branch? |
| Tutis: | Yes. |

                    *                    *                    *

12

> The Court:    [A]re you guilty of conspiring to engage in money laundering as
>               charged in Count Thirteen of the Indictment?
> Tutis:        Yes.

Tutis Rule 11 Tr. at 33-39.  Notably, Tutis did not simply answer yes to each factual

basis question, but rather disagreed with a few and explained his answers.  See, e.g.,

Tutis Rule 11 Tr. at 37, lines 1, 16-17, 19; at 38, lines 13-17. Moreover, when the Court

asked Tutis four times if he was guilty, he said yes.  Tutis Rule 11 Tr. at 34 & 35 (as to

Count 1); 34 & 38-39 (as to Count 13).

    The only explanation Tutis seems to offer for pleading guilty (and apparently lying

under oath repeatedly during his Rule 11 proceeding), can be found on page 4 of his

motion.  There he states: "Notwithstanding his plea colloquy professing guilt, his only

thoughts were of the additional charges that could be brought against his wife and the

additional sentence she would face.  Therefore, he entered a plea of guilty."  Def.

Motion at 4.  Yet he presents no proof that the Government threatened additional

charges (which it did not), what those additional charges might be, and what additional

sentences they would carry.  In fact, the Government already had superseded the

Indictment twice and a jury had already been selected.

    In addition, as for his professed concern over "the additional sentence [Vega]

would face," id., the Government made it clear to both defendants that it was willing to

give an overly generous break to Vega—a 60 month sentence recommendation despite

her indictment on both drug-trafficking and money laundering conspiracies—only if the

parties could resolve both cases simultaneously.  Once Tutis rejected the plea offer and

demanded either a conditional plea or a stipulated trial, the Government decoupled the

13

plea agreements and negotiated a sentencing recommendation for Vega—78 months—
that, while still generous, was more appropriate to her actual criminal conduct.

As in Siddons, "while [Tutis] states that he is innocent, he does not, as required,
cite to any record evidence that would support his claim of innocence or sufficiently
explain the contradictory position he took during the plea colloquy."  660 F.3d at 703.

### c.    A Multitude of Other Evidence Establishes Tutis's Guilt Beyond a Reasonable Doubt.

Leaving aside for the moment Tutis's multiple sworn attestations of guilt, there is
a plethora of other evidence in this case demonstrating his guilt.  There are numerous
conversations recorded during the wiretaps showing that Tutis was dealing drugs and
laundering drug proceeds.  He gave three extensive proffers in which he admitted to
numerous crimes, including but not limited to the conduct charged in Counts 1 and 13 of
the indictment.  Numerous codefendants, including Vega, provided sworn statements
during their Rule 11 proceedings supporting factual bases for the drug-trafficking
conspiracy in which they participated with Tutis and others.  Finally, there was ample
physical evidence seized in this case from the Tutis residence, including two firearms, a
bulletproof vest, 12 cell phones, a Foodsaver vacuum bag sealing device, a digital
scale, and $62,000 in cash.  During the investigation, law enforcement seized three
kilograms of cocaine and ten kilograms of heroin, and other evidence tied those
seizures to Tutis.  Finally, several cooperating witnesses were prepared to testify at trial
about their drug-trafficking activities with Tutis.  Thus, the notion that Tutis is innocent is
absurd, and he fails the first prong of the Siddons test.

14

## C.     The Reasons Tutis Has Proffered in Support of His
##        Motion Do Not Justify the Withdrawal of His Guilty Plea.

The second part of the three-part test is whether Tutis "has proffered strong

reasons justifying the withdrawal" of his guilty plea.  See Siddons, 660 F.3d at 703.

Tutis bears a "substantial" burden in demonstrating "fair and just reason[s]" for

withdrawal.  Id.  None of his reasons are convincing standing by themselves, none have

any supporting evidence, and all are contradicted by the facts, including his own sworn

statements.

### 1.     Defendant Had Sufficient Time to Discuss His Plea Agreement
###        with Counsel and Understood It.

It is clear from the Rule 11 proceeding transcript that Tutis had all the time he

needed to discuss the plea agreement with Farrell and that he understood all aspects of

that agreement and the plea proceeding.  Whenever there was a question, the Court

either waited patiently while Farrell talked to Tutis and/or the prosecutors, or took a

recess and allowed more extensive discussions.[11]

Tutis's claim that he did not understand aspects of the Rule 11 proceeding are

belied by the following colloquy he had with the Court.

| | |
|---|---|
| **The Court:** | Have you had any difficulty reading and understanding all the legal documents in your case? |
| **Tutis:** | No, I didn't have a problem. |
| **The Court:** | Do you understand your plea agreement and each of its terms? |
| **Tutis:** | Yes |
| **The Court:** | Is there anything that you don't understand that you need to speak with Mr. Farrell about at this time? |
| **Tutis:** | No. |

---

[11] Since these extensive breaks are not necessarily obvious from the hearing transcript, the Government respectfully requests that the Court make a record to this effect at the upcoming hearing on the instant motion.

15

| | |
|---|---|
| **The Court:** | Have you had enough time with Mr. Farrell to decide what to do about this case? |
| **Tutis:** | Yes. |

Tutis Rule 11 Tr. at 19-22.[12]

At one point during the Rule 11 proceeding, Farrell requested a change to the appellate waiver provision of Tutis's plea agreement.  See id. at 8-10.  The Court halted the proceeding so that the Government's appellate chief could review and approve Farrell's proposed changes.  During that interlude, Tutis had ample time to consult with his attorney about any other issue(s) or questions about the agreement. The Government agreed to the change Farrell requested on the condition that both Farrell and Tutis "take their time to read this plea agreement again from cover to cover so that they understand everything in there and there's no more surprises. . . . we're willing to make that change with this condition."  Id. at 11.  Neither Farrell nor Tutis rejected this condition.[13]  Instead, Farrell told the Court "I believe we've had a meeting of the minds as to this issue."  Id. at 12.

Moreover, to the extent that Tutis now claims he did not understand all of his plea agreement, he must explain why he answered affirmatively these two questions the Court posed to him: (1) "Have you read your plea agreement?"; and (2) "Have you gone

---

[12] When the Court posed the converse to Farrell ("And have you had sufficient time to discuss it with your client and to answer any and all of his questions?"), Farrell responded affirmatively.  Tutis Rule 11 Tr. at 14.

[13] Again, although Tutis's Rule 11 transcript does not indicate this, the Government respectfully requests that the Court make a record at the upcoming hearing on the instant motion that there was a delay during the proceeding at that point: the Court and the Government sat and waited silently while Farrell and Tutis both reviewed the plea agreement in its entirety.

over it carefully with Mr. Farrell?" <u>Id.</u> at 20-21.  Again, he has offered no explanation whatsoever.

Defendant wants the Court to believe that "he did not understand the consequences of his plea."  Def. Motion at 5.  As the Court is aware, the Rule 11 colloquy is designed to ensure that all defendants are completely advised of those consequences, both direct and collateral.  <u>See</u> Tutis Rule 11 Tr. at 6-9, 31 (direct); 6, 32 (collateral). Here, the totality of the circumstances establishes beyond any doubt that defendant understood his plea agreement and was not shy about speaking up if he did not understand or disagreed with one of its terms.

### 2. Defendant Knew There Was No Going Back; He Could Not Withdraw His Plea.

Defendant was well aware that once the Court accepted his guilty plea, there was no going back.  The Court made that clear: "but if we go forward today and if I accept your plea, then do you understand that that's it, . . . you can never come back another day and say, Judge, I didn't know what I was doing back on November 1st, or Judge, I don't want to plead guilty anymore? Do you understand that?"  Tutis answered yes. <u>Id.</u> at 18.[14]

But there is another reason why Tutis knew that there was no going back.  After Tutis rejected his interlocking plea, he made it clear through counsel that he wanted a conditional plea agreement, and he ultimately got one.  This was a significant—and

---

[14] Later during the proceeding, the Court again addressed this issue; it told Tutis: "If you plead guilty it's an admission that you're factually guilty, and you could never come back to this Court or some other court and say I really am not guilty of what I'm pleading to in Counts One and Thirteen.  Do you understand that?"  Farrell asked for time to discuss this with Tutis, after which Tutis answered "I guess, yes."  Tutis Rule 11 Tr. at 25.

uncommon—concession by the Government.  Given his concern, it is clear that he would have paid, and did pay, close attention to the provisions in the plea agreement dealing with his reservation of appellate rights.[15]  Under the heading "Conditional Agreement" on page 2 of the Nov. 1, 2017 plea agreement, see Exh. 6 at 2, the agreement reads as follows:

> Pursuant to Federal Rule of Criminal Procedure 11(a)(2), the parties agree that, notwithstanding any other provision of this agreement, Toye Tutis may withdraw his guilty plea if he appeals the denial of a suppression motion filed by Toye Tutis on the grounds specified in Schedule A, paragraph 9 of this agreement and prevails on that appeal.  The parties further agree that there shall be no other circumstances under which Toye Tutis may withdraw his guilty plea.

See Exh. 6 at 2 (emphasis added).  The last sentence of this paragraph told Tutis in no uncertain terms that once he pled guilty pursuant to this plea agreement, he could not thereafter withdraw his plea.[16]

### 3. Defendant's Plea Was Voluntary and Was Not Coerced.

During the Court's questioning of Tutis, there was absolutely nothing about Tutis' responses that gave the Court pause as to Tutis's mental state or whether his statements were voluntary.  Tutis Rule 11 Tr. at 25.  Nor did Farrell say anything that cast doubt on the voluntariness of Tutis's decision to plead guilty.  See id. at 14 & 15

---

[15] Assuming arguendo that Tutis was not all that interested in other provisions of his plea agreement, it is simply inconceivable that he would be uninterested in the conditional agreement part of his plea agreement.

[16] Tutis's claim that "[h]e was not advised and did not understand the heightened standard of withdrawing a guilty plea . . . ," Def. Motion at 6, makes no sense.  There would have been no reason for Farrell to have advised Tutis about withdrawing a guilty plea when (a) he was guilty, and (b) he voluntarily signed his plea agreement.  He also claims that he was advised to "essentially 'try[] his case' through post-conviction appeals," and that he now realizes that such advice was "misguided."  Id.  Again, he offers no proof whatsoever to support this claim.

(Farrell believed Tutis's decision was knowing and voluntary); 15 & 16-17 (Farrell knew of no reason why the Court should not accept the plea).

Although Tutis insists his plea was not voluntary, Def. Motion at 4, Tutis has made several factual claims about voluntariness that are false or misleading.  First, Tutis claims "that he was advised to enter into the [plea] agreement and seek to appeal certain issues post-conviction."  If true, this was good advice from his attorney: since he was not actually innocent, his best chance of beating the charges was to appeal and hopefully prevail on his wiretap suppression arguments.  Yet when the Court asked him whether he was pleading guilty because his attorney recommended that he do so, or whether it was because it was his own decision, he acknowledged that it was his personal decision.  Tutis Rule 11 Tr. at 22; see Siddons, 660 F.3d at 702, 703 (defendant claimed his attorney had "browbeaten" and "pressured" him into pleading guilty; court rejected this claim).  Furthermore, Tutis answered "yes" when the Court asked him whether he was "pleading guilty of [his] own free will," and "no" when the Court asked him whether "anyone forced him to plead guilty or threatened [him] to make [him] plead guilty.  Tutis Rule 11 Tr. at 19.[17]

Tutis also claims that he was subjected to "immense pressure" to voluntarily forfeit [several legitimate] businesses."  Def. Motion at 3.  This is false because the indictment's Forfeiture Allegations did not list any businesses to be forfeited.[18]  There

---

[17] Likewise, in Tutis's Rule 11 Application, see Exh. 8, at 5, ¶ 36; see also note 6 supra, Tutis declared under penalty of perjury that he had "not been forced, coerced or threatened in any manner by any person to plead GUILTY to these charge(s)."  See also Exh. 8, at 6, ¶ 44 ("I offer my plea of GUILTY freely and voluntarily and of my own accord . . . .").

[18] Certain, but not all, property owned by businesses operated and controlled by Tutis and Vega was forfeited, but at no time did the indictment or any plea agreement seek to forfeit such businesses.

was nothing in the plea agreement requiring the forfeiture of any businesses.  And at one point during the proceeding, the Court asked Tutis whether he had any questions about his forfeiture obligations, to which Tutis responded "no."  Tutis Rule 11 Tr. at 50.

### 4. The November 1, 2016 Plea Agreement Was the Final Agreement;  There Were No Other Agreements or Deals.

Tutis claims that he had an interlocking plea agreement with Vega and that nobody advised the Court of this situation.  Def. Motion at 2.  The reason that nobody so advised the Court is because it was not true.  As discussed above, the history and chronology of the plea negotiations makes clear that, although initially interlocking plea agreements were offered, Tutis rejected his.  Thereafter, the Government decoupled the plea negotiations.  Tutis never requested a "package deal," and Vega affirmatively wanted out of the package deal so she could plead guilty with or without Tutis doing so.

Tutis wants to absolve himself of all responsibility for this state of affairs.   He says that "[d]uring his Rule 11 hearing, the Court was not advised that Mr. Tutis had entered into a package deal.  The Court inquired of the parties whether there were any deals or understandings that were not contained in the parties' plea agreement.  Mr. Farrell responded, 'No' and the Government did not interject to correct [his] response." Def. Motion at 2.  Yet Tutis would have the Court believe that he for some reason had to remain silent as everyone around him both lied to and concealed matters from the Court.  See Tutis Rule 11 Tr. at 17 (the Court advised Tutis that "if at any time you want to discuss matters with Mr. Farrell, then just tell me so and you and he can have any discussions that you need to have . . . .").

Moreover, at his Rule 11 proceeding, when the Court asked three different people (Farrell, AUSA Carrig, and Tutis), whether the November 1, 2016 plea

agreement was the final form of his plea agreement, all three answered yes.  Tutis Rule 11 Tr. at 8 (Farrell), 4 (Carrig), 21 (Tutis).  Not a peep was heard to the contrary from any of the three, but especially from Tutis.  In addition, AUSA Carrig orally summarized the plea agreement at length and made no mention of interlocking plea agreements.  Id. at 4-8.  When she finished, the Court asked Farrell whether he agreed "that the November 1st letter [was] the complete plea agreement in this case?" Farrell responded "I do." Id. at 8.[19]

During the proceeding, the parties made several changes to that plea agreement as a result of Farrell's objections to certain provisions in it.  When the Court asked Tutis about those changes, and whether he initialed them, Tutis again answered yes.  When the Court asked him "[a]nd with those changes is that your complete plea agreement,"[20] Tutis answered affirmatively.  And when the Court asked Tutis "[h]as anyone promised you anything different than what's in this plea agreement," Tutis answered no.  Id.[21]

The Court has observed Tutis during a number of court proceedings.  The Government respectfully requests that when the Court rules on the instant motion, it make a specific factual finding that on a number of occasions, Tutis has spoken directly to the Court about various matters; leaned over to converse with his attorney before,

---

[19] Right after Farrell said that, he questioned the language in the waiver of appeal provision in the plea agreement.  After some discussion about this between the Court and counsel, see Tutis Rule 11 Tr. at 8-13, the Court again asked Farrell "is this now the complete plea agreement?" and Farrell answered affirmatively.  Id. at 13.

[20] At another point during the proceeding, after the parties made a change in the plea agreement at Farrell's request, the Court again asked: "is this now the complete plea agreement?"  Farrell responded affirmatively.  Tutis Rule 11 Tr. at 13.  Again, Tutis said nothing.

[21] Of course, the final plea agreement itself contains an integration clause, see Exh. 6 at 13, which Tutis knew about because he read the whole agreement.  See, e.g., Tutis Rule 11 Tr. at 20-21 (Tutis answered yes to the question "Have you read your plea agreement?").

during, and after his attorney addressed the Court on various matters; and was an active participant in all court proceedings.  It is important that such a record be made if and when the Court denies the instant motion and Tutis appeals that decision.  The Court will recall that during the recent hearing on February 24, 2017 (see ECF No. 434 (Minute Entry)), during which the Court appointed Stanley King to represent Tutis, Tutis addressed the Court at length about the Luis motion.  Tutis's conduct at the various hearings in this case demonstrates that Tutis absolutely knew that if things happened in court with which he disagreed, he could make his views known directly to the Court.

### 5.    Tutis Knew the November 1, 2016 Plea Agreement Was Very Different From Preceding Versions.

Finally, Tutis was on notice that his final plea agreement had changed substantially from the October 27, 2016 proposed interlocking plea agreement, which he rejected and never again requested.  At the end, he had no "package deal"; his claim to the contrary is a complete fabrication.

First, as noted earlier, he rejected the October 27, 2016 proposed plea agreement.  That agreement was not only an interlocking plea agreement, it also was significantly more favorable to Vega than her final plea agreement.  Second, the Government put Tutis on notice at his Rule 11 proceeding that things had changed substantially.  After Farrell complained about a change regarding the appellate waiver, Tutis Rule 11 Tr. at 8-10, AUSA Wiener said: "This plea agreement is very different than the plea agreement that was accepted in principle on Friday . . . . It's very clear it's very

different." Id. at 10.[22]  Hence, Tutis's claim that he was unaware that the final plea

agreement he accepted was different from the October 27 agreements is baseless.[23]

Third, the interlocking nature of the October 27, 2016 plea agreements was

immediately apparent to any reader: the interlocking language was in the very first

paragraph of those agreements.  See Exhibits 2 & 3.  If the final plea agreements

contained the same provision, what reason would there have been for the Government

to relocate it to some other place in the plea agreements? Assuming arguendo that

Tutis did not read his entire final plea agreement, and therefore lied under oath when he

told the Court he had, see Tutis Rule 11 Tr. at 20-21, he surely saw and read the first

paragraph.  He knew there was no "package deal."

### D.    The Government Would Not Be Prejudiced by the Withdrawal as Long as It is Given Sufficient Time to Prepare for Trial.

The third and last prong of the three-part Siddons test is whether the

Government would be prejudiced by the withdrawal of the plea.  The Government is

aware that certain factors, like the death or other unavailability of witnesses, can be

cited as prejudicial.  If the sentencing of cooperating witnesses is postponed, the

Government should be able to present all the evidence it planned to present at the trial

that was scheduled to start last November.  Other than having to devote substantial

resources to a long trial, the Government concedes that it will not be prejudiced should

---

[22] Vega and her attorney were present during the Tutis Rule 11 proceeding.  Tutis Rule 11 Tr. at 2.  At no point did she or her attorney advise the Court that they thought that Tutis's plea was interlocking with her plea.

[23] AUSA Wiener stated at that time that "[i]f the defense wants to take more time to review [the plea agreement], then they'll take more time to review it. . . .  so if they need more time, they need more time." Tutis Rule 11 Tr. at 10.  The defense said nothing.

the Court decide that defendant has made the required showing for the withdrawal of his plea.

### III.   THE LUIS MOTION IS MOOT FOR SEVERAL REASONS AND ALSO IS WITHOUT MERIT.

Despite the fact that defendant pled guilty, he requests that the Court decide a pretrial motion that he filed seeking the release of certain assets to pay attorney's fees. This motion has been referred to by all parties as "the Luis motion."  See ECF Document 322, at 49-59.  The Court should not decide this motion because it is moot for several reasons.  But if the Court nevertheless decides to address the merits of the motion, it should be denied.

Defendant does not present any new legal arguments but instead states that he is relying "substantially on his previously submitted pleadings."  Def. Motion at 6. On the merits of the motion, the Government does likewise.  But because the motion is moot, there is no reason for the Court to address its merits.

This motion is moot for several reasons.  First, defendant has pled guilty.  It is black letter law that unless a defendant reserves his right at the time of his plea to raise certain issues on appeal, he has waived those issues.  See, e.g., United States v. Kingcade, 562 F.3d 794, 797 (7th Cir. 2009) ("All non-jurisdictional issues not specifically preserved in the conditional plea agreement are waived").  Federal Rule of Criminal Procedure 11 specifically mentions conditional pleas.  Rule 11(a)(2) states that "a defendant may enter a conditional plea of guilty . . . , reserving in writing his right to have an appellate court review an adverse determination of a specified pretrial motion." Although defendant did enter a conditional plea, he did not specify the Luis motion in his

plea agreement as one of the issues about which he reserved his right to appeal.[24]
Because the Court did not rule on the Luis motion prior to Tutis's entry of his plea, there
was no "adverse determination" of that motion.  If Tutis wanted to reserve his right to
appeal an adverse determination of that motion, he could have told the Court he would
not plead until the Court ruled on the motion, invoking Rule 12(d), which requires a court
to "decide every pretrial motion before trial."  Defendant, however, did not do so.

      Moreover, the basis of defendant's Luis motion has now changed.  When he filed
it, he claimed he needed funds to pay counsel in his federal case.  In his recent motion
(which he combined with his motion to withdraw his plea), he claimed that he needs
funds to pay counsel in his state case.[25]  The Court should not countenance this new
claim.  Since he obtained appointed counsel in his federal case after Farrell was
convicted and disqualified from representing him, his original Luis motion—seeking
funds to pay Farrell—is moot.  Tutis's recent motion provides no authority for the
proposition that a federal judge has jurisdiction to decide a right to counsel issue in a

---

[24] It should be noted that Farrell insisted on substituting his own language for that of the Government concerning the issues Tutis was reserving his rights to appeal under the conditional plea.  Under standard contract law, which applies to plea agreements, United States v. Yemitan, 70 F.3d 746, 747 (2d Cir. 1995) ("[p]lea agreements are construed according to contract law principles"), the language "should be construed against the drafter."  United States v. Tilley, 786 F. Supp. 2d 862, 866 (W.D. Pa. 2011) ("[P]lea agreements are analyzed according to contract principles"); see United States v. Brye, 146 F.3d 1207, 1210 (10th Cir. 1998) ("As with the interpretation of any contract, we also apply the maxim that the [plea] agreement should be construed against its drafter"); United States v. Gotti, 457 F. Supp. 2d 411, 415 (S.D.N.Y. 2006) ("But if there is any ambiguity, the terms of a plea agreement, like the terms of a contract, must be construed against the drafter"); United States v. Baird, 218 F.3d 221, 229 (3d Cir. 2000) (in light of the government's "tremendous bargaining power," courts must "strictly construe the text" of the plea agreement against the government when it has drafted the agreement) (emphasis added).

[25] Tutis also claims that he would "like to retain the services of investigators and experts to assist in his defense."  Def. Motion at 6.  That claim should be given little, if any, weight.  In light of his guilty plea in federal court, where he provided a factual basis under oath which can be used against him in the state court proceeding, that means that he has no reasonable prospect for going to trial in state court, especially if the instant motion fails.  As the Court is aware, the likelihood of his prevailing on suppression issues in state court, given their thorough briefing by the parties and consideration by this Court, is very low.

state case, whether or not that decision would involve the release of assets that are to be forfeited, and the Government knows of no such authority.[26]

The <u>Luis</u> motion also is moot because Tutis, both in his plea agreement, <u>see</u> Exh. 6, at 4-11, and during his Rule 11 proceeding, <u>see</u> Tutis Rule 11 Tr. at 45-50, consented to the forfeiture of all the forfeited assets except the four properties that the parties agreed would not be forfeited.

During that Rule 11 proceeding, the Court ensured that Tutis understood the nature of his conditional plea and the forfeiture provisions in his plea agreement.  The Court asked Farrell: "have you gone over the issues on which he reserves the right to appeal that are listed in Paragraph 9 [of the plea agreement] as amended?"  Farrell said he had.  Tutis Rule 11 Tr. at 16.  As for forfeiture, the Court asked Tutis whether Tutis, before he signed the plea agreement, discussed its forfeiture provisions with Farrell; Tutis answered affirmatively.  <u>Id.</u> at 47.  And when the Court asked Tutis "Do you have any questions about your forfeiture obligations?," Tutis said no.  <u>Id.</u> at 50.  That was his opportunity to say: when will you decide the <u>Luis</u> motion?  But he said nothing.  In reliance on the plea agreement and Tutis's and Farrell's statements during the proceeding, the Court ultimately issued a forfeiture order, <u>see</u> ECF Document 423,

---

[26] Tutis avers that he "has lost the ability to defend himself in his state case" and that "[t]his is undoubtedly a constitutional violation."  Def. Motion at 6-7.  During a recent conversation with the state prosecutor, she indicated that the state court judge will be holding a hearing soon regarding the situation with Tutis's counsel in that case.  She said that Farrell has not been disqualified from that case yet, although he is disqualified from practicing law in New Jersey.  <u>See</u> Feb. 16, 2017 Order of the New Jersey Supreme Court (attached hereto as Exhibit 10).

which by its terms is final as to Tutis.  Both Farrell and Tutis consented to and signed that order.[27]

In the final plea agreements, there were four properties that the agreements obligated the Government not to forfeit if certain conditions precedent were satisfied. Ultimately, those conditions were satisfied and the properties were not forfeited.  The equity in those properties totals several hundred thousand dollars.  Tutis can use them to retain private counsel in his state case, if he so chooses.  In addition, there are other properties that the Government did not move to forfeit, which Tutis can use for the same purpose.

In light of the above, the Government respectfully requests that the Court dismiss the Luis motion as moot.  If the Court decides to rule on the motion on its merits, the Government respectfully requests that the Court deny the motion as wholly without merit.

Respectfully submitted,

WILLIAM E. FITZPATRICK
Acting United States Attorney

By:     s/ Howard Wiener
        HOWARD WIENER
        DIANA VONDRA CARRIG
        JONATHAN PECK
        Assistant U.S. Attorneys

Dated:  March 30, 2017
At:     Camden, NJ

---

[27] Attached hereto as Exhibit 9 is a letter to the Court dated January 5, 2017, in which the Government requested that the Court enter the Consent Preliminary Order of Forfeiture as to Tutis, which all parties executed.