IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|                          |                                  |
| ------------------------ | -------------------------------- |
| UNITED STATES OF AMERICA | HON. JEROME B. SIMANDLE          |
| v.                       | Criminal No. 14-699-1 (JBS)      |
| TOYE TUTIS,              | **OPINION**                      |
| Defendant.               |                                  |

**APPEARANCES**:

CRAIG CARPENITO
United States Attorney
     By:  DIANA VONDRA CARRIG,
          Assistant United States Attorney
UNITED STATES ATTORNEY'S OFFICE
401 Market Street, 4th Floor
P.O. Box 2098
Camden, NJ  08101-2098

STANLEY O. KING, ESQ.
KING & KING, LLC
231 Broad Street
Woodbury, NJ  08096
     Attorney for Defendant

**SIMANDLE, District Judge**:

## I.  INTRODUCTION

On November 1, 2016, after the jury had been selected and
as the trial was about to begin, following extensive plea
negotiations between counsel over a period of one week,
Defendant Toye Tutis entered a plea of guilty to Count 1 (drug-
trafficking conspiracy) and Count 13 (money laundering
conspiracy) of the Second Superseding Indictment.  The only co-

defendant then remaining was his wife, Jazmin Vega, who also
entered her plea of guilty to Count 13 of the Second Superseding
Indictment (money laundering conspiracy).

Thereafter, Defendant Tutis, through new counsel,[1] filed the
present motion to withdraw his plea of guilty pursuant to Rule

---

[1] Defendant Tutis was originally represented by retained counsel,
Dennis J. Cogan, Esq. and Christopher D. Warren, Esq. On June 29,
2016, the Court had a hearing upon Defendant Tutis' request to
substitute J. Michael Farrell, III, as his new retained attorney,
notwithstanding the fact that Farrell was under indictment for
unrelated charges in the U.S. District Court for the District of
Maryland. Defendant Tutis testified that he was aware of
Farrell's charges and of the potential conflict it created by
Farrell representing Tutis while being himself under indictment
(albeit represented by counsel in Maryland), and the Court granted
Tutis' request honoring his choice of counsel, being satisfied
that his waiver of conflict-free counsel was knowing and voluntary.
[Docket Item 299.] About four months after Farrell entered the
case, Tutis entered his plea of guilty on November 1, 2016. Two
months after Tutis entered his guilty plea, Farrell's case went to
trial in January 2017, and a jury found him guilty of multiple
counts, including money laundering, money laundering conspiracy,
tampering with official proceedings, and witness tampering. (Tr.
6/23/17 at 149.) Farrell awaited his sentencing scheduled for
July 17, 2017, and he expected to go to prison. (Id. at 149-50.)
When Farrell's case was going to trial, new counsel Stanley O.
King, Esq. was appointed pursuant to the Criminal Justice Act on
January 3, 2017 as temporary standby counsel [Docket Item 428],
and on February 14, 2017 as plenary counsel [Docket Item 435],
when, at a hearing, the Court also disqualified Farrell due to his
felony convictions. The appointment of Mr. King followed this
Court's determination that Tutis was no longer able to afford
private counsel due to his agreement in his guilty plea to forfeit
his interest in very substantial assets, pursuant to which a
Consent Judgment and Preliminary Order of Forfeiture as to Tutis
has been entered on January 6, 2017. [Docket Item 423.] Farrell
confirmed at the February 14, 2017 hearing, however, that his fees
had been paid by Tutis and nothing further was due. Mr. King has
very ably represented Tutis in the present matter.

11(d)(1)(B), Fed. R. Crim. P. [Docket Item 443]. Co-defendant

Jazmin Vega does not seek to withdraw her guilty plea.

Defendant Tutis moves to withdraw his plea of guilty on the

ground that "Mr. Tutis' Guilty Plea was not voluntary and the

Court was not advised that the plea was part of a 'Package

Deal'" requiring Tutis to plead guilty or Vega would not be

permitted to plead guilty. [Docket Item 443-1 at 4.] Tutis

alleges that, because Tutis' and Vega's pleas were allegedly a

"package deal," the Rule 11 hearing violated the rule of United

States v. Hodge, 412 F.3d 479, 450 (3d Cir. 2005), requiring

"full disclosure to the district court of the material terms of

the plea agreements" so that the court can conduct a "colloquy

[that] is thorough and searching as to the defendant's knowing,

intelligent, and voluntary waiver of the right, among others, to

a jury trial." Id. Tutis argues that the court failed to ask

him the special questions related to his decision to accept the

alleged package deal, as required by Hodge, 412 F.3d at 491-92.

The defense brief asserts that Tutis was "advised by attorney

[Farrell] that he should accept the plea and appeal this

acceptance post sentencing," and he now alleges he "did not

understand the heightened standard of withdrawing a guilty plea

post sentencing." [Def. Br., Docket Item 443-1 at 5.]

3

Contrary to Tutis' assertions, the Government has argued that the Tutis and Vega pleas were not a "package deal" by the time the plea agreements were executed and the Rule 11 hearings for both defendants were held on November 1, 2016. The Government acknowledged that previous written versions of the Tutis and Vega agreements in late October had contained such language packaging the agreements, conditioning entry of one upon entry of the other. The actual written plea agreements, signed by Tutis and Vega and entered at the hearing on November 1, 2016, had no such coupling language, and were in fact not coupled or "packaged."

As explained in more detail below, during plea negotiations, Tutis had at least twice rejected proposed packaged agreements. The prosecutors then proposed uncoupled agreements in late October 2016, whereby Vega could plead guilty independent of her husband's decision, and the final plea agreements were not a "package deal" and the coupling language was removed from both defendants' proposed agreements. After Tutis won major concessions in the final plea agreement such as preserving his right to appeal certain pretrial suppression motion rulings and diminishing the amount of his assets subject to forfeiture, he accepted the plea agreement. Tutis' plea agreement, preserving his right to contest certain pretrial

suppression motion rulings on appeal, was thus entered as a "conditional plea" under Rule 11(a)(2), Fed. R. Crim. P.

The Tutis and Vega plea agreements, entered independently on November 1, 2016, were indeed uncoupled. Because the defendants were husband and wife, there was overlapping language only as to the interests each defendant was forfeiting in the properties that were jointly owned, or at least as to which a spouse might otherwise claim an interest even if not titled in both names. Accordingly, neither the prosecutors nor the defense attorneys suggested to the Court that a special <u>Hodge</u> colloquy was needed, nor did the court regard them as a package deal, as will be discussed below.

This motion also requires that the defendant's somewhat revised position be addressed -- namely, that Tutis nonetheless thought that the pleas remained coupled, and that he still felt pressured to enter an involuntary plea in order to set up an issue for appeal, namely, the alleged denial of a <u>Hodge</u> colloquy at the Rule 11 hearing. Although Tutis elected not to testify at the evidentiary hearing on this motion, this alternative hypothesis was advanced by former attorney Farrell, who did testify. As explored further, the defense has failed to demonstrate that any <u>Hodge</u> colloquy was required or that if such a colloquy had been undertaken, Tutis would have decided to go

5

to trial or his attempt to plead guilty would have been seen as involuntary. Indeed, Tutis faced multiple counts that pegged him as the leader of a major conspiracy to distribute very large quantities of cocaine, heroin, and crack cocaine in the Atlantic City area over a period of years, together with the prospect of an enhanced sentencing information under 21 U.S.C. § 851 that the Government had delayed filing as plea negotiations continued which, in the event of conviction, would have doubled the mandatory minimum sentences upon the drug distribution charges he faced. See 21 U.S.C. § 841(b)(1)(A). Moreover, Tutis affirmed, in his signed plea agreement, his Application for Permission to Enter Plea of Guilty, and in his Rule 11 colloquy with the Court, that his decision to accept the Government's plea bargain was voluntary, entered of his own free will, and not coerced.

Moreover, as discussed in Parts II.G and III below, the record in general, and this motion in particular, is bereft of any doubt of Tutis' guilt of the crimes to which he has pled guilty. Other than conclusory statements such as that he "continues to maintain his innocence as to the charges brought against him" [Docket Item 443-1 at 2], he has not buttressed this assertion by facts in the record supporting a defense;

indeed, no defense to guilt has been proffered, which, as explained below, also weighs against the relief he seeks.

For the reasons found herein, the motion will be denied.

## II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  The Hearing on this Motion

The facts pertaining to this motion are derived from the docket of this case and from the evidentiary hearing on the motion conducted June 21, 23, and 26, 2017, including exhibits received into the record from the Government and from Defendant Tutis.[2] The hearing witnesses were Jazmin Vega (Tr. 6/21/17 at 13-119); former Tutis attorney J. Michael Farrell (Tr. 6/21/17 at 121-186 and Tr. 6/23/17 at 1-230); and Jazmin Vega's attorney Troy Archie (Tr. 6/26/17 at 4-145).  Defendant Tutis waived his right to testify (Tr. 6/26/17 at 148-150), which the Court accepted, (id. at 150:12-14), so Tutis has offered no testimony in support of his motion.  No AUSA or case agent testified.

### B.  The Charges in the Second Superseding Indictment

Defendants Toye Tutis and his wife Jazmin Vega, together with others who entered pleas of guilty on related charges, were

---

[2] The Government's exhibits included Exs. G-7, 8, 11, 13, 21, 22, 30, 33, 35, 36, and 36A (as a transcript aiding understanding of taped conversation).  The Defendant's exhibits included Exs. D-1 through 18.

charged in a Second Superseding Indictment.  [Docket Item 339.][3]

Tutis faced the following charges as the alleged leader of major

drug distribution and money laundering conspiracies:

Count 1 –       drug trafficking conspiracy in
                Atlantic County, NJ, from February
                2010 through December 10, 2014, with
                Jazmin Vega and others to distribute
                cocaine (5 kg. or more), and heroin
                (1 kg. or more), contrary to 21
                U.S.C. §§ 841(a)(1) and (b)(1)(A),
                in violation of 21 U.S.C. § 846;

Counts 7-9 –    drug distribution of more than
                500 g. cocaine on October 1,
                November 17, and November 26, 2014,
                in violation of 21 U.S.C.
                § 841(b)(1)(B);

Count 13 –      money laundering conspiracy in
                Atlantic County, NJ, from February
                2010 through December 10, 2014, with
                Jazmin Vega with intent to promote
                carrying on drug distribution
                activity, to conceal and disguise
                the nature and source of the
                proceeds of the unlawful activity,
                and to avoid the currency
                transaction reporting requirement
                set forth in 31 U.S.C. § 5313(a),
                contrary to 18 U.S.C. §§
                1956(a)(1)(A)(i), 1956(a)(1)(B)(i),
                and 1956(a)(1)(B)(ii), all in
                violation of 18 U.S.C. § 1956(h);

Counts 21-25 -  use of telephone to further a drug
                offense on various occasions in
                2014, in violation of 21 U.S.C.
                § 843(b); and

---

[3] Altogether, 12 defendants had been charged in this case, of which
all 11 others (except one fugitive) pled guilty at various times
before jury selection herein.

Counts 26-27 – unlawful possession of firearms
                             by a felon, in violation of 18
                             U.S.C. § 922(g)(1).

     Jazmin Vega was charged in Counts 1, 13, 24, and 25 above.

     In addition, the Second Superseding Indictment contained

forfeiture allegations pertaining to the interests, if any, of

Tutis and Vega in certain cash and firearms found in Tutis' home

in a search warrant, as well as various bank accounts, vehicles,

and over 30 pieces of real estate that were alleged to be the

proceeds of the charged criminal activity.[4]  Further, the

Government reserved its right to file an enhanced penalty

information pursuant to 21 U.S.C. § 851 in the event no plea

agreement was reached.  The deadline date for filing the

enhanced penalty information was enlarged with Tutis' consent

even after jury selection as plea negotiations continued in late

October 2016.  [Docket Item 391.]

     This Second Superseding Indictment [Docket Item 339], filed

in September 2016, a month before the scheduled trial date, was

_____

[4] The Second Superseding Indictment contained two separate sets of
forfeiture allegations against Tutis and Vega, the First
Forfeiture Allegation and the Second Forfeiture Allegation, each
containing lengthy and largely identical lists of assets and
property to be forfeited as allegedly a result of the money
laundering offense in Count 13 (First Forfeiture Allegation) and
the controlled substance offense alleged in Count 1 (Second
Forfeiture Allegation).  [Docket Item 339 at p. 10-25.]
Differences between the items listed in the First and Second
Forfeiture Allegations do not matter for purposes of the present
motion.

the culmination of several years of investigation including court-authorized electronic interceptions resulting in thousands of intercepted calls and text messages pertaining to drug distribution, money laundering, and other crimes among the alleged co-conspirators.  It had taken counsel almost two years to prepare for trial, given the volume of discovery, pretrial motions, substitution of counsel, charges and guilty pleas by other defendants, and the complexity of the case.  All co-defendants except Tutis and Vega had entered pleas of guilty prior to trial.

## C. **Preparation for Trial and Plea Negotiations – Late October 2016**

Leading up to the trial date of October 18, 2016, all counsel indicated that the case would benefit from having some delay after jury selection and before opening statements to better prepare for trial and attend to recently-filed evidentiary motions.  Such a delay would also enable either defendant to attempt to negotiate a satisfactory guilty pleas, if desired, before trial actually commenced.  The jury selection process was completed on October 18 and 19, 2016, and the jury was instructed to return on Monday, October 31, 2016 to begin trial.  Meanwhile, in addition to the motion practice and hearings on October 19 and 31, 2016, the parties continued plea negotiations among themselves, with Mr. Farrell representing

Toye Tutis, Troy Archie, Esq., representing Jazmin Vega, and AUSA's Howard Wiener and Diana Carrig representing the United States.

In short, the Government offered written plea agreements dated October 27, 2016 to Vega (Ex. D-1) and Tutis (Ex. D-8) which were linked to each other, that is "packaged," providing that fully executed copies of plea agreements for both Vega and Tutis had to be received by 9:00 P.M. on October 27, 2016 or both agreements would be null and void. (Id.) The initial coupling of the Tutis and Vega pleas was prominently mentioned in the proposed plea agreements' first paragraph in the same sentence stating the deadline for acceptance, which stated:

> This plea agreement supersedes all prior plea
> offers and is contingent upon the execution of
> a plea agreement dated October 27, 2016 by co-
> defendant Toye Tutis [sic: Jazmin Vega], and
> the entry of her guilty plea pursuant to that
> agreement.

(Ex. D-8 at p.1.) Similar language appeared prominently in Vega's proposed plea agreement linking it to Tutis'. (Ex. D-1 at p.1.) Vega accepted and signed the October 27th plea agreement on that date (Ex. D-2), but Tutis did not. As a result, Vega's acceptance became a nullity. Tutis told Farrell he did not accept the October 27th plea offer because it did not preserve his right to appeal the suppression rulings and because it did not preserve sufficient assets from forfeiture. (Farrell

11

Testimony, Tr. 6/23/17 at 49:2 to 50:6.)  Tutis sought to

negotiate a more favorable agreement for himself, including

forfeiture of fewer properties and preservation of rights to

appeal certain pretrial rulings.  (Farrell Testimony, Tr. 6/2/17

at 136:5 to 137:6.)  Tutis likewise told Vega he rejected the

package deal of October 27th due to Tutis' concerns about the

forfeiture of too many properties and to preserve his

conditional appeal.  (Vega Testimony, Tr. 6/21/17 at 69:10-15.)

     On Friday, October 28th, the Court conferred with all

counsel who requested that the jury should not be asked to

return on October 31st because a resolution of the cases with

Vega and Tutis was still possible; Mr. Farrell advised that if a

suitable plea agreement was not negotiated with the Government,

that his client might be amenable to a stipulated non-jury trial

to preserve rights to appeal pretrial suppression motion

denials.  (Farrell Testimony, Tr. 6/21/17 at 136:12-22.)

Counsel asked for more time over the weekend to see if Tutis and

the Government could arrive at a stipulation for an abbreviated

non-jury trial on all counts; Jazmin Vega was not to be part of

the stipulated trial of Toye Tutis.  (See Archie Testimony, Tr.

6/26/17 at 29-32.)  That Vega would be free to enter her own

plea -- and thus be decoupled from Tutis, who would have a

stipulated non-jury trial -- became clear from these procedural developments as of October 28th.

At a hearing on October 31st, in the presence of all counsel and both defendants, it was revealed that Farrell and AUSA Carrig communicated over the weekend of October 28th-30th, exchanging proposed stipulations for the Tutis-only consent trial, while Farrell and AUSA Wiener resumed plea negotiations regarding Tutis. (Tr. 10/31/16, Ex. D-17 at 3:19 to 8:16.) Farrell's testimony also confirmed that he spent considerable effort with AUSA Carrig over the weekend working on these consent trial stipulations. (Tr. 6/23/17 at 77-79.) The October 31st conference included some discussions of how the stipulated trial of Tutis would be conducted. (Tr. 10/31/16, Ex. D-17, at 3-5, 8.) This is, of course, strong evidence that the fates of Tutis and Vega were diverging and uncoupled by October 31st. The substance of the parties' plea negotiations was not disclosed at that time, since final written agreements had not been made. The undersigned, consistent with Fed. R. Crim. P. 11(c)(1), did not participate in any plea negotiations; the Court's interest at that time was solely in managing the waiting jury and the Court's calendar, and determining whether the parties' requests to defer the start of trial for further negotiations should be accommodated.

### D.  **The Proposed Plea Agreements are Unpackaged**

By October 31st, the Government agreed with Mr. Archie that
Vega should be permitted to plead guilty independently of her
husband's decision.  AUSA's Wiener and Carrig negotiated the
uncoupled plea with Mr. Archie, who also assured Vega that she
would be permitted to plead guilty even if Tutis did not.

Thus, Mr. Archie texted his client, Ms. Vega, on the
morning of November 1st, that the Government had agreed that
Vega could plead guilty even if Tutis did not -- in other words,
that the pleas were not coupled.  Archie's text stated:  "I
still have you worked if Toye is acting crazy."  (Ex. G-11.)
Mr. Archie testified that this was meant to reassure Vega that
she could still plead guilty regardless of what Tutis decided to
do.  (Tr. 6/26/17 at 7-10.)  Mr. Archie explained that he had
asked AUSA Carrig to let Vega plead without being tied to Tutis
because he thought Tutis did not have Vega's best interests at
heart.  (Id. at 26-27.)  Ms. Vega also recalled in her testimony
that she met with Mr. Archie and AUSA Carrig in a small
conference room in the courthouse, and that AUSA Carrig also
told her she would be allowed to plead guilty, for which Ms.
Vega thanked AUSA Carrig.  (Tr. 6/21/17 at 94:4 to 95:1.)
Attorney Archie also recalled the conversation with AUSA Carrig
and his client Jazmin Vega, the substance of which was that the

Government would accept a guilty plea from Vega "no matter what Toye Tutis did" (Tr. 6/26/17 at 31:20 to 32:16), for which Jazmin Vega expressed thanks. (Id. at 32:17-18.)

On the evening of October 31st, consistent with this understanding that Vega could plead guilty whether or not Tutis chose to do so, the Government provided uncoupled plea agreements to counsel for both defendants, with the prominent coupling language of previous drafts deleted. Because of the uncertainty of Tutis' situation, as Tutis pressed for more concessions, the Government had demanded slightly more onerous terms in Vega's new uncoupled plea agreement of October 31st (Ex. G-5) compared with the earlier coupled version of October 27th (Ex. D-1). (Vega's October 31st draft plea agreement is set forth in Ex. G-5, while the draft agreement proposed to Tutis on October 31st appears at Ex. G-4.) No coupling language appeared in defendants' drafts. (Id.)

At the October 31st status hearing, AUSA Wiener also revealed that the new draft agreements were the product of discussions with counsel but did not yet bear signatures of their clients. (Tr. 10/31/16, Ex. D-17 at 13.) The Government, as noted, had a new agreement in principle with Mr. Archie (Ex. D-17 at 13:2-7), but Ms. Vega herself needed to review and accept the new terms. (Id.) On the other hand, the course to

be chosen by Mr. Tutis -- whether a guilty plea, a negotiated disposition (i.e., a non-jury stipulated trial), or a jury trial -- was still unknown on October 31st, according to AUSA Wiener, who said that the Government was preparing for all three possibilities.  [Ex. D-17 at 24:10-12.]  Also, Mr. Farrell indicated that one unsettled aspect of the negotiations pertained to forfeitures and obtaining agreements from two individuals -- Amanda Tutis and Kyle McHuge -- to quitclaim any interests they had in several of the properties to be forfeited. (Id. at 4:6-24.)  This was part of a larger compromise on forfeitures whereby some of the subject properties would be returned to Tutis and Vega.

Also, at the October 31st hearing, in the context of expressing appreciation to the Marshal's Office and the General Counsel of FDC Philadelphia for permitting joint discussions with Tutis and Vega for plea negotiation purposes, Farrell observed "these are tied pleas" (Tr. 10/31/16 at 6:1-20.)  At that time in the afternoon of October 31st, no one corrected Farrell's statement as it was not known what path the negotiations might take.  Indeed, the decoupling of the pleas was not confirmed until later that evening, when AUSA Wiener, at 8:29 PM, emailed Farrell a newly drafted proposed plea for Tutis to sign, with no language tying Tutis' plea to Vega's.  (Ex. D-

13.)  AUSA Wiener enlarged the deadline for Tutis to accept until 11:00 A.M. on November 1st.  (Id.)  Farrell attempts in his testimony to vest great significance into his remark about the pleas being "tied" at that earlier time.  (See, e.g., Tr. 6/23/17 at 7, 17.)  Farrell claimed he did not notice, and no one informed him, that the agreements were now uncoupled (id. at 12-15), and he in fact testified that "if I had noticed that that language was excised, it probably would not have changed my view that it was coupled, that they were continuing to be tied" (id. at 16:18-20), which this Court finds to be incredible as well as illogical.

### E.  Final Negotiations on November 1st

Negotiations on the Tutis plea continued on November 1st at the courthouse.  Even though Tutis and attorney Farrell knew Jazmin Vega had reached agreement and was ready to plead guilty, Tutis declined and pressed, through Farrell, for more concessions in his own plea decreasing the list of properties to be forfeited as well as preserving his right to appeal certain pretrial suppression rulings.  Mr. Archie testified that Farrell told him on November 1st that Tutis would not plead guilty if the Government did not make more forfeiture concessions, including "carve-back" provisions.  (Tr. 6/26/17 at 51.)  Everyone also recognized that the final lists of forfeited

17

properties and "carve-backs" (<u>i.e.</u>, properties seized by the
Government from Tutis and Vega and to be returned to them as a
condition of their pleas) should be identical if both decided to
plead guilty, or it would complicate the Government's forfeiture
process on any jointly-held properties.  Thus, as Farrell
negotiated for Tutis with the Government on November 1st, Archie
waited to enter Vega's plea until the final forfeiture language
could be inserted in Vega's plea agreement.  (<u>Id.</u> at 39-41, 68.)
Vega's separate plea was worked out in principle on October 28th
(<u>id.</u> at 89) and only the forfeiture piece remained for last-
minute adjustments on November 1st, according to Mr. Archie,
whose testimony I credit in its entirety.[5]  (<u>Id.</u> at 92:21.)  If
Tutis did not plead guilty, Mr. Archie was prepared to put
Jazmin Vega's plea through on its own, since it was decoupled
from Tutis.  (<u>Id.</u> at 116.)  There was no reason that Vega and
the Government would not proceed with Vega's separate guilty

---

[5] In his testimony, Mr. Archie was called upon to explain prior
inconsistent statements he made in a certification he prepared in
connection with this motion (Docket Item 452-3), including his
recollection that the final pleas of Vega and Tutis were packaged.
(<u>Id.</u> ¶ 15.)  Mr. Archie explained why that was not accurate and
how his recollection of events was sharpened by preparing for the
hearing, including reviewing his file and being interviewed by the
Assistant U.S. Attorneys.  (Archie Testimony, Tr. 6/26/17 at 67:16
to 69:10; 93:14-21.)  Mr. Archie's explanations for why his
hearing testimony was more accurate than his prehearing
certification prepared from memory ring true and consistent with
the circumstances.  By his demeanor and non-combative responses,
Mr. Archie was a highly credible witness.

plea on November 1st if Tutis didn't enter a plea agreement.
(Id. at 121.)

### F.    **Final Agreements are Reached on November 1st**

Late in the afternoon on November 1st, following more Tutis
demands and negotiations, the plea agreements were in final
form, uncoupled and not conditioned upon entry of a plea by the
other spouse.  Vega's final plea agreement of November 1st (Ex.
G-7), uncoupled from Tutis', pertained only to Count 13 and
increased the amount of money laundering activity for which she
accepted responsibility, from $1.5 million to $3.5 million,
which increased her projected Sentencing Guideline range
compared with the earlier coupled agreement.  Mr. Archie
believed the Government had a strong case after he reviewed
several hundred tapes of conversations and surveillance reports
pertaining to drug distribution and money laundering
conspiracies.  (Tr. 6/26/17 at 146.)  Vega agreed that this
higher figure reflected her actual criminal conduct in this
case.  (Tr. 6/21/17 at 78:13.)  Mr. Archie had explained to Vega
that in the earlier package deal, the Government was willing to
give her a break as an inducement to Tutis to plead guilty (Tr.
6/21/17 at 78:8), as to which the Government agreed to advocate
for a sentence for Vega no greater than 60 months.  Now that the
pleas were unpackaged, the projected Guideline range increased

somewhat with the enhanced money-laundering amount, and the
Government would only agree to advocate for a sentence no
greater than 78 months. (Id. at 78:13; 83:15.) The final
agreement was more favorable to Vega in other respects, for
example, in obtaining a carve-out for her laundromat property at
1011 Arctic Avenue, which was expected to be a source of her
future employment and income, and several other properties.
(Id. at 88:15 to 89:14; Ex. G-7 at p. 13.) Between the October
31st draft plea agreement (Ex. G-3) and the final plea agreement
for Vega (Ex. G-7), only the forfeiture provisions changed, in a
manner that was favorable to Vega by excluding several
properties. (Tr. 6/21/18 at 90:19 - 94:3.) Vega testified that
she still thought her final, unpackaged agreement was fair and
that she was satisfied with it. (Id. at 101.) That Vega's
exposure increased in the renegotiated, unpackaged plea
agreement is further strong evidence that her plea and Tutis'
were not packaged when entered on November 1st because the
"volume discount" for packaged pleas was no longer in play.

Tutis' separate final plea agreement, also unpackaged (Ex.
D-14), was also dated, signed, and entered on November 1, 2016.
The language coupling his plea with Vega was deleted from the
first paragraph (Ex. D-14), and nobody from the Government
indicated that the two pleas were dependent on each other.

Tutis entered his plea first, before Vega, not because the pleas were packaged requiring him to plead guilty first, but simply because his name was first on the case caption and the Marshals had to take him back to his place of confinement in FDC Philadelphia, as it was about 5:40 PM, while Vega remained free on conditions of release. (See Tr. 11/1/16 at 11:19-25; and Archie Testimony, Tr. 6/26/17 at 59:25 to 60:13, and colloquy with Mr. King in Tr. 6/26/17 at 110-113.)

## G. Tutis' Rule 11 Hearing on November 1st; Farrell's and Tutis' Statements

The plea which Tutis now seeks to set aside was presented in a 17-page letter (Ex. D-14), which he and Farrell signed on November 1st, accompanied by an Application for Permission to Enter Plea of Guilty, also signed by both Tutis and Farrell on November 1st. (Ex. G-8.) The 53-page transcript of Tutis' hearing on November 1st (Ex. D-16) established that all requirements of Rule 11, Fed. R. Crim. P., were easily met, especially including Tutis' voluntariness in deciding to enter this agreement. Defendant Tutis' written plea agreement was entered as Ex. C-1 at the November 1st hearing, while Defendant's Application for Permission to Enter Plea of Guilty (hereafter "Tutis Application") was entered as Ex. C-2. (See Tr. 11/1/16 (Ex. D-16) at 13:25; 18:23; 20:21.) For example, the hearing began with the Government identifying the written plea

agreement, which also included an addendum stipulated issues and of language reserving the right to appeal certain issues, as the parties' complete plea agreement. (Id. at 2:16-4:8.) The Government orally paraphrased the terms of the written agreement at length. (Id. at 4:18-8:7.) Terms regarding waiver of certain appeal rights and preservation of others were clarified by counsel on the record. (Id. at 8:11-13:24.)

Farrell confirmed on several occasions that the document, including the various interlineations carefully added and initialed by him and by Tutis, was the complete plea agreement (id. at 13:22-24), that he believed that Tutis' decision to plead guilty was knowing and voluntary (id. at 12:20-22), that he knew of no reason the Court should not accept Tutis' plea of guilty (id. at 15:23-25; 16:21-23; 51:4-7), and that he believed it was in Tutis' best interest to enter this plea (id. at 16:24-17:1.)

Tutis was sworn and understood he should raise questions about anything he did not understand and to feel free to discuss any matter confidentially with his attorney (id. at 17:18-18:1), because he "can never come back another day and say, Judge, I didn't know what I was doing back on November 1st, or Judge, I don't want to plead guilty anymore." (Id. at 18:2-7.) That scenario, of course, is exactly what Tutis is attempting to do

in his present motion to withdraw his guilty plea on the ground of involuntariness.

The Tutis plea colloquy, with Farrell's participation, could scarcely have been more exacting on November 1st. Before the hearing even began, Tutis had been in continuing discussions with Farrell and negotiations with the Assistant U.S. Attorneys, capping a week of talks. Tutis completed his Application with the assistance of Farrell. Tutis impresses as an intelligent, articulate, and self-directed person, which Farrell has confirmed in his testimony. (Tr. 6/23/17 at 39:22 to 41:19.) He had been a businessman who, prior to 2014, had run an HVAC company, a construction company, and a real estate management company. (Id. at 39:7-21.) He was very involved in his own defense, discussing case law and seeming familiar with the legal concepts. (Id. at 40:2 to 42:14.) In other words, Tutis made up his own mind about decisions with Farrell in plea negotiations.

Significantly for present purposes, Tutis indicated in his Application (Ex. G-8) that "I have not been forced, coerced or threatened in any manner by any person to plead GUILTY to these charges. Nor have I been told that if I refuse to plead GUILTY, other persons will be prosecuted." (Ex. G-8 at ¶ 36, emphasis added.) This declaration was further acknowledgement by Tutis

that his decision to plead guilty was uncoerced and he could decide to refuse to plead guilty without consequences to the prosecution of "other persons," i.e., Jazmin Vega. Tutis also declared that "I have read [my plea agreement] or had it read to me" (id. ¶ 37) and that "I offer my plea of GUILTY freely and voluntarily and of my own accord with full understanding of all matters set forth in the ... Indictment..., in this application, and in the certification of my lawyer which is attached to this application." (Id. at ¶ 44.) Farrell's "Certification of Counsel" upon the Application likewise declared, among other things, that Tutis' declarations "are in all respects accurate and true" and that Tutis' plea of guilty "is voluntarily made with understanding of the consequences of the plea. I recommend that the Court accept the plea of GUILTY." (Id., "Certification of Counsel" 3 & 9.) Farrell, of course, tried to negate these very certifications in his testimony upon the present motion, as discussed.

In his oral testimony at the November 1st hearing, Tutis indicated he was "pleading guilty of [his] own free will" and that nobody "forced [him] to plead guilty or threatened [him] to make [him] plead guilty." (Tr. 11/1/16, Ex. D-16, at 19:19-24.) Tutis confirmed that he read his plea agreement and went over it carefully with Farrell before deciding what to do in the course

of a week of back-and-forth negotiations.  (Id. at 20:25-21:8.)
Tutis indicated that he initialed the pen-and-ink changes and
that, with those changes, this is his "complete plea agreement"
and that nobody has promised anything that's different from the
written plea agreement.  (Id. at 21:9-22.)  Likewise, Tutis
testified there was nothing in the agreement he did not
understand, that he accepted the plea agreement, and that it was
his personal decision to accept the final plea agreement.  (Id.
at 22:2-12.)

Tutis responded at length to questions acknowledging his
knowing and voluntary waiver of constitutional rights (id. at
22:13-25:9), and about the sentencing risks and procedures (id.
at 25:10-33:1), which are matters not disputed in the current
motion.

Tutis then proceeded to answer detailed questions (which he
had reviewed with Farrell beforehand, see id. at 33:2-10)
establishing a factual basis for his guilt on Counts 1 and 13 of
the Second Superseding Indictment.  He first admitted he is
guilty of Count 1.  (Id. at 34:13-15.)  Tutis admitted to the
charged conspiracy to distribute drugs in Atlantic County, New
Jersey, from February of 2012 through December 10, 2014
involving 150 to 450 kilograms of cocaine and approximately 26
kilograms of heroin.  (Id. at 34:16-35:17.)

Tutis likewise provided a factual basis for his guilt on Count 13, admitting conspiring with Jazmin Vega to launder money by conducting financial transactions with funds that were the proceeds of drug trafficking. (<u>Id.</u> at 35:18-36:4.)  Tutis would go to banks with Vega and exchange small denomination bills for $50's and $100's, and package and ship the larger bills on multiple occasions to Los Angeles, for the purpose of enabling himself and others to purchase more heroin and cocaine for distribution. (<u>Id.</u> at 36:5-37:6.)  Tutis admitted he structured the cash transactions through various branch banks to knowingly avoid the bank's $10,000 cash reporting threshold in a 24-hour period. (<u>Id.</u> 37:24 to 38:23.)  Tutis also swore that he understood and accepted all the stipulations in Schedule A of his November 1st plea agreement, which repeat many of the incriminating facts of his oral plea colloquy. (<u>Id.</u> at 39:10-40:4.)[6]

---

[6] The lengthy stipulations in Schedule A of the final Tutis plea agreement, Ex. D-14, included many admissions of his factual guilt of conspiracy to distribute drugs and conspiracy to launder drug proceeds.  For example, he admitted the Count 1 drug conspiracy offense involved 150 to 450 kilograms of cocaine, and that he possessed a dangerous weapon in connection with it, and that he was an organizer, leader, manager, or supervisor of the relevant criminal activity.  (Ex. D-14 at Sch. A, ¶¶ 3(a), (b), and (c).) Similar stipulations covered Tutis' admissions of guilt in the Count 13 money laundering conspiracy.  (<u>Id.</u> at ¶¶ 4(a), (b), and (c).)

Accordingly, both attorneys indicated they were satisfied that Tutis' answers established a factual basis for accepting the guilty plea (id. at 40:14-18), and the Government proffered that if the case had gone to trial, it was prepared to prove each essential element of every count of the Second Superseding Indictment beyond a reasonable doubt. (Id. at 40:19-24.)

In the present motion, consistent with his guilty plea, neither Tutis nor his counsel have proffered any factual basis for doubting his guilt. Tutis raises no criticism of the factual bases of his guilty pleas on Counts 1 and 13, above, nor does he suggest any reason whatsoever that he believes himself not to be guilty. This important consideration is addressed further below in Part III. A. 1.

In his November 1st guilty plea hearing, Tutis also acknowledged that he understood and voluntarily agreed to conditionally waive his right to appeal if his sentence is 330 months or less, except that his right to appeal the enumerated pretrial rulings is preserved regardless of the sentence, all as part of his negotiated plea agreement, (id. at 41:2 to 42:8), consistent with the stipulations in his written plea agreement at ¶ 9 and pages 15A and 15B thereof. (Id.)[7] The attorneys

_____

[7] The Court similarly reviewed with Tutis his waiver of the right to seek post-conviction relief under 28 U.S.C. § 2255 consistent with his plea agreement, if his sentence is 330 months or less,

again indicated their satisfaction that the record established Tutis' knowing and voluntary waivers of appeal and post-conviction relief. (Id. at 43:20-24.)

The Court asked Tutis additional questions regarding the forfeiture provisions of the plea agreement at pages 4-11 thereof enumerating the many real properties, accounts, vehicles, jewelry, and cash that he agreed to forfeit (id. at 45:17 to 50:23), all of which Tutis understood, and he agreed to forfeit his ownership interest. (Id.) He had discussed the forfeiture provisions in detail with Farrell and these were, as noted above, the subject of continued hard bargaining by Tutis, winning additional concessions from the Government on November 1st. (Id. at 47:7-12.) Mr. Tutis indicated he had no questions about his forfeiture obligations (id. at 50:21-23), and both counsel likewise indicated that no further questions were needed about forfeiture or any other topic (id. at 50:24 to 51:3), and that the Court should accept the guilty plea (id. at 51:4-7.)

## H.    Farrell's Attempts to Undermine his Rule 11 Hearing Certifications

---

except that his right to claim ineffective assistance of counsel in a § 2255 motion is preserved, as also noted in his plea agreement. (Id. at 42:9 to 43:19.) Tutis again indicated he wished to do so as part of his negotiated plea agreement, after having discussed the matter with Farrell. (Id. at 43:4-19.)

In the hearing on the present motion, Farrell testified at
some length that, at the conclusion of the Rule 11 hearing, he
professed he was surprised that the Court did not ask Tutis
questions required by the Hodge case, supra, in cases where
there are packaged guilty pleas. (See, e.g., Tr. 6/21/17 at
171:24 to 172:24, 175:14 to 179:20.) He testified that earlier
in the week, when the Vega and Tutis plea proposals were tied,
he had done legal research and read the Hodge case and discussed
it with Tutis to prepare Tutis for a Hodge colloquy about
voluntariness. (Id. at 175:14 to 176:15.) He discussed with
Tutis, during the week before November 1st, the Hodge
considerations about packaged or coupled pleas. (Id. at 180:17
to 181:6.) Tutis was prepared to answer the Hodge colloquy
questions involving his willingness to enter a packaged plea,
including "the implicit concerns with respect to tied pleas."
(Id. at 175:23-24.) Farrell never expressed doubt that Tutis
acknowledged the special burdens of a packaged plea, accepted
them, and would have entered a knowing and voluntary agreement
to a packaged plea agreement.

Of course, the pleas were no longer packaged by November
1st, and neither the Government nor the Court considered there
was any need for a Hodge colloquy. Farrell now claims that even
though he believed a Hodge colloquy was required to protect his

client's interests in a voluntary plea, he opted to remain silent and to make no such request of the Court. (<u>Id.</u> at 177:6 to 178:13.)[8]  He claims he chose not to bring <u>Hodge</u> to the Court's attention, despite knowing the protective purposes of the <u>Hodge</u> colloquy in a packaged plea, claiming he "chose loyalty to my client." (<u>Id.</u> at 178:1-2.)  He testified on direct exam that he essentially wanted to inject such supposed error into the Court's plea hearing so that it could serve as a basis for setting his plea aside, and he supposedly did not see it as his burden to bring up the <u>Hodge</u> requirements.  (<u>Id.</u> at 177:12 to 178:13.)  He recalled briefly advising Tutis after the Rule 11 hearing that "the <u>Hodge</u> component was missing and that it would affect the voluntariness of his plea." (<u>Id.</u> at 179:6-8.)

---

[8] In a packaged plea, both the prosecutor and the defense counsel have the duty to bring the matter to the Court's attention and to request the Court to conduct the additional colloquy concerning same.  The <u>Hodge</u> court makes it clear that "the parties" have those obligations, <u>Hodge</u>, 412 F.3d at 491 ("We therefore hold that the parties must notify the district court that a package deal exists and state to the court on the record the specific terms of the deal.  <u>See</u> Fed. R. Crim. P. 11(c)(2)").  If that wasn't clear enough, the Hodge court explicitly noted:  "Prescriptively, as officers of the court, defense counsel have no less of a duty to follow the rules of disclosure than prosecutors.  This duty includes disclosing that a plea bargain is a package deal."  <u>Id.</u> at 491 n. 14.  Farrell's contention that a defense attorney who believes <u>Hodge</u> is implicated can knowingly choose to remain silent is legal nonsense.  This is another reason Farrell's recollection of events is not credible.

I do not believe Farrell's testimony in the present motion
in June 2017, that he still believed, on November 1st, that the
pleas were still coupled and that a <u>Hodge</u> colloquy was still
needed.  First, Mr. Archie, who was continuously involved with
Farrell as the negotiations progressed, did not expect any <u>Hodge</u>
questioning to occur because the pleas were uncoupled, and he
was not surprised.  (Tr. 6/26/17 at 142:17 to 143:1.)  Second,
Mr. Farrell's actual conduct at the November 1st hearing was to
assure the Court that nothing was left out of the Rule 11
colloquy and that no further questions regarding Tutis' decision
to plead guilty were needed.  (Tr. 11/1/16, Ex. D-16, at 50:24
to 51:3.) The Court accepts Farrell's assurances on November 1st
as well-founded and accurate, namely, that Farrell actually
believed all proper questions had been asked and answered and
that Tutis' plea should be accepted, because it was knowing and
voluntary and based on his perceptions of his client.  His
testimony on this motion, on the other hand, is a corrupt
attempt to help Tutis' cause seeking to set aside a valid guilty
plea by pretending that he and Tutis understood the pleas to be
coupled or packaged together, forcing his client to plead guilty
involuntarily, even though they weren't, and in any event, any
decision by Tutis was voluntary.  Third, Farrell indicated on
November 1st that Tutis' decision to plead guilty was indeed

knowing and voluntary (id. at 12:20-22), and Farrell's testimony identifies no basis to conclude that Tutis' decision was involuntary; indeed, the record reflects that Tutis rejected earlier plea offers that actually were coupled and would have been more favorable to Jazmin Vega than the final, uncoupled plea which was the result of Tutis' hard bargaining to preserve for himself certain appellate rights by means of a conditional Rule 11(a)(2) plea and to forfeit fewer properties without regard for increasing Vega's exposure to imprisonment as shown above. Fourth, Farrell, having been convicted of felony offenses in January 2017, is less worthy of belief; by the time of his testimony on this motion in June 2017, Farrell had been disbarred, awaited sentencing in the District of Maryland, and no longer jeopardized his law license by lying for a client since he had already lost it. Fifth, observing Farrell's demeanor as a witness, I observed he seemed most uneasy when the subject of the questioning turned to Tutis' voluntariness, as if he was trying to keep his "story" straight. Sixth, Jazmin Vega herself understood that the pleas were no longer packaged and that she would plead guilty under the deal negotiated by Mr. Archie whether or not Tutis ultimately decided to do so. Farrell's testimony amounts to a clumsy and unethical attempt by

ex-counsel to "fall on his sword", albeit a fabricated sword, for the benefit of setting aside a conviction.

### I. Would Tutis Have Rejected Conditional Plea if He Fully Understood it was not Packaged with Vega's Plea?

Moreover, even if one assumes (for the sake of argument and contrary to the credible evidence) that Tutis somehow did not understand that his plea agreement was not coupled with Vega's, Defendant Tutis has failed to show that he would not have entered his plea of guilty if he knew it was unpackaged, or that he would have manifested a degree of involuntariness or coercion that would impair his plea. The facts show that Tutis' motivation came from his desire to get the best plea agreement he could by (a) preserving appellate rights as to certain pretrial suppression rulings in a conditional plea, (b) ending the very real and proximate threat of the Government's filing of an enhanced penalty Information under 21 U.S.C. § 851 within the next day if he decided not to plead guilty, and (c) clawing back certain valuable properties that the Government had seized for forfeiture. He had, in fact, rejected the proposed packaged plea agreement of October 27th and persisted in doing so for the next four days of negotiations. When the pleas were unpackaged and his three demands, above, were met, he accepted late on the afternoon of November 1st.

Defendant Tutis' moving brief asserted that Tutis, at the time of entering his guilty plea, was "overcome by force, fear, and misapprehension." [Docket Item 443-1 at 6; see also id. at 5 ("he was overcome by force, misapprehension and fear".)] Insufficient evidence exists that he was motivated in a meaningful way by fear for his wife's prosecution. He, of course, cared about his wife and even told her he was pleading guilty for her sake [Tr. 10/31/16 (Ex. D-5) at 3:15-20] on October 31st, but on the morning of November 1st, he rejected the plea offer of October 31, 2016, that the defense now incorrectly claims was still "packaged" with hers. If he truly believed the pleas were still packaged, it follows that he also knew that his rejection would force his wife to go to trial even though she had essentially stated, in her Frye hearing before trial on October 17th, that she was desirous of reopening her plea negotiations with the Government before trial commenced. (Tr. 10/18/16 at 6:22 to 7:8.) Nowhere in Farrell's testimony does he offer facts supporting the notion that Tutis would have chosen to reject the Government's final offer that actually met his three objectives, above, if it was unpackaged from Vega's plea. Nor is there any inference in the record that Tutis would have given answers in his Rule 11 colloquy demonstrating involuntariness or coercion. Regarding the earlier discussions

of a packaged deal, Farrell testified that he thought Tutis'
considerations of the impact on his wife and his daughter Amanda
(as to forfeiture issues) were "all variables in the calculus of
his decision" (Tr. 6/21/17 at 181:17), and there were times in
those discussions when Tutis would be frustrated with the
negotiations and "kind of throw up his hands and indicated that,
well, I'm just going to go to trial.  That would happen during
the course of our dynamic." (Id. at 181:17-20.)  While
Farrell's testimony, if it is believed, indicates Tutis had
plenty of frustration or ambivalence about pleading guilty, such
a situation is far from unusual and hardly gives pause about
voluntariness.  The fact is that the guilty plea happened as
soon as the Government met Tutis' demands, none of which
involved Vega (other than perhaps the non-forfeiture of the
laundromat property that she runs for income).  The defense
never addressed the salient issue of whether Tutis likely would
have rejected the final plea deal if he had understood it to be
unpackaged on November 1st.

Personality-wise, Farrell's assessments of Tutis were that
he was an intelligent person who ran several construction
companies, understood and discussed legal issues and asked
questions, reviewed Farrell's briefs before filing, and was not
particularly easy to persuade (Tr. 6/23/17 at 38-48.)  Again,

there is no evidence that Tutis was not well-informed, intelligent, and more than capable of making his own decisions whether or not to plead guilty. This too cuts against his plea being involuntary. This, of course, is consistent with Tutis' testimony at his Rule 11 hearing on November 1st that it was his personal decision and not just his attorney's recommendation that he accept this plea agreement. (Tr. 11/1/16 at 22:9-12.) In other words, in light of the credible evidence, it clearly appears that Tutis would have accepted the final, renegotiated plea agreement of November 1st, and the benefits it conferred upon him, whether or not it was packaged with Vega's agreement, and that Tutis would not have given answers that suggested concerns of involuntariness or coercion.

### III. <u>LEGAL ANALYSIS</u>

### A. <u>Requirements for Withdrawal of Guilty Plea</u>

Rule 11(d)(2)(B), Fed R. Crim. P., provides in relevant part that "[a] defendant may withdraw a plea of guilty ... (2) after the court accepts the plea but before it imposes sentence if: ... (B) the defendant can show a fair and just reason for requesting the withdrawal." Prior to the adoption of Rule 11(d)(2)(B), the Third Circuit had held that withdrawal of a guilty plea before sentencing should be "freely allowed," applying previous Rule 32(d), Fed. R. Crim. P., as in <u>United</u>

36

States v. Young, 424 F.2d 1276, 1279 (3d Cir. 1970) and United
States v. Herrold, 635 F.2d 213, 215 (3d Cir. 1980).  Since
1983, however, when Rule 32(d) was amended to provide a more
exacting standard for withdrawal of a guilty plea before
sentencing, the defendant must meet a "substantial" burden of
demonstrating the "fair and just reason" for withdrawal.  United
States v. Siddons, 660 F. 3d 699, 703 (3d Cir. 2011).  Thus,
"[o]nce a court accepts a defendant's guilty plea, the defendant
is not entitled to withdraw that plea simply at his whim."
United States v. Jones, 336 F.3d 245, 252 (3d Cir. 2003).

 "When determining whether a defendant has shown a 'fair and
just reason' for withdrawing a plea, a district court must
consider whether: '(1) the defendant asserts his innocence; (2)
the defendant proffered strong reasons justifying the
withdrawal; and (3) the government would be prejudiced by the
withdrawal.'"  Siddons, 660 F.3d at 703 (quoting United States
v. King, 604 F.3d 125, 139 ((3d Cir. 2010)).  We next address
these Siddons factors.

### 1. Whether Defendant Asserts his Innocence

 Under the first prong in Siddons, supra, we examine whether
Defendant Tutis asserts his innocence to the charges to which he
has pled guilty, namely Count 1 (drug distribution conspiracy)
and Count 13 (money laundering conspiracy).  Under Siddons, any

assertions of innocence "must be buttressed by facts in the record that support a claimed deference," and a defendant must "sufficiently explain the contradictory position he took during the plea colloquy." Siddons, 660 F.3d at 703 (internal quotes omitted).  A defendant must make more than a "bold assertion of innocence." United States v. Wilson, 429 F.3d 455, 458 (3d Cir. 2005).  After all, a plea of guilty, under oath, upon the record including acceptance of a written plea agreement and its factual stipulations and admissions of guilt as in this case, is a "solemn admission" of guilt.  United States v. Isaac, 141 F.3d 477, 485 (3d Cir. 1998).  As noted above, Tutis, in his Rule 11 hearing, as in in his final plea agreement and in his Application to Enter Plea of Guilty, not only admitted his guilt on Counts 1 and 13, but also stipulated to committing the factual elements of each crime, in detail.

The present motion is bereft of any proffer of facts in the record casting doubt on Tutis' guilt.  Other than a generalized clause that "Mr. Tutis continues to maintain his innocence as to the charges brought against him" [Docket Item 443-1 at 2], there was no proffer that some element of guilt was missing or even debatable.  Neither Farrell's testimony nor Vega's testimony at the hearing on this motion discussed anything that questioned Tutis' guilt, the strength of the evidence against him, or some

sort of newly discovered exculpatory evidence.  Not
surprisingly, defense counsel's closing argument candidly
conceded that there is no record evidence that supports Tutis'
claim of innocence.  (Tr. 6/26/17 at 179:18-24.)  Although
counsel also argued that the defendant's mere assertion of
innocence suffices the Rule 11(d)(2)(B) burden under <u>Siddons</u>,
Third Circuit precedent calls upon the district court to assess
whether the defense has buttressed a generalized assertion of
innocence with "facts in the record that support a claimed
defense."  <u>Siddons</u> <u>supra</u>, 660 F.3d at 703.

It is, of course, possible that a defendant's detailed
admissions of guilt under oath were all perjury, where the
individual has other reasons for falsely admitting to the
charged crimes.  The purposes of the careful Rule 11 colloquy,
under oath or affirmation, are aimed at preventing the
conviction of an innocent person.  This is not such a case.[9]

---

[9] Tutis apparently argues that his numerous admissions of guilt in
his November 1st plea hearing were false because he was overwhelmed
with concern for his wife, as "his only thoughts were of the
additional charges that could be brought against his wife and the
additional sentence she would face."  (Defendant. Br. Docket Item
443-1 at 4.)  The hearing on the present motion, however, yielded
no evidence that the Government threatened additional charges
against Vega if Tutis did not plead guilty.  Such additional
charges against Vega, where the indictment had already been amended
twice and the jury had already been selected, had essentially no
possibility of occurring.

If Tutis is arguing that he has a meritorious defense to admission of wiretap or other surveillance evidence against him at trial, and therefore wishes to retract his guilty plea to preserve an appeal of those pretrial suppression motion rulings in the event of conviction at trial, that contention is not new nor is it incompatible with his decision to enter a conditional guilty plea. Preserving appellate rights was an essential demand of his plea negotiations, upon which he succeeded. Tutis entered into his conditional plea agreement under Rule 11(a)(2), Fed R. Crim. P., preserving his right to raise certain issues on appeal. This is not a case where he needs to retract a guilty plea to do so.

Accordingly, the first _Siddons_ factor militates against permitting withdrawal of this plea because there is no plausible claim of innocence.

### 2. Whether Defendant Presented Strong Reasons Justifying the Withdrawal

#### a. Lack of _Hodge_ Colloquy

Tutis initially claimed he should be allowed to withdraw his guilty plea because it was packaged with Vega's plea and the Court did not undertake an appropriate Rule 11 colloquy to assure voluntariness under United States v. Hodge, 412 F.3d 479 (3d Cir. 2005). In Hodge, the Third Circuit addressed a concern about "package deal" pleas where the Government "accepts a

defendant's guilty plea on the condition that his co-
defendant(s) also plead guilty." Hodge, 412 F.3d at 490 (citing
United States v. Caro, 997 F.2d 657, 658 (9th Cir. 1993)). The
Court of Appeals noted that "[f]amilial or fraternal coercion of
putative confederates in package deals is a serious concern" and
the court warned that "offers of leniency or adverse treatment
for some person other than the accused... might pose a greater
danger to inducing a false guilty plea by allowing the
assessment of the risks a defendant must consider." Id. at 489
(citations omitted). Hodge thus required that the parties
inform the district court of the packaged pleas "to insure that
the Fed. R. Crim. P. Rule 11 colloquy is thorough and searching
as to the defendant's knowing, intelligent, and voluntary waiver
of the right, among others, to a jury trial." Id. at 490.
These Hodge duties apply to prosecutor and defense attorney
alike, who must inform the Court of the packaged plea that
triggers the Court's duty to propound the Hodge colloquy
questions, as noted above.

Where one plea is conditioned upon another defendant's
plea, the district court, as part of its obligations to assure a
knowing and voluntary plea, must take special care that the
precise terms of the package deal are placed upon the record,
including clarity on "how a defendant's plea benefits his

41

confederate(s)." Id. at 491-92. The Court of Appeals suggested

the topics of the enhanced plea colloquy.[10]  In the present case,

as found above, the Tutis plea was not packaged when entered on

November 1st.  No Hodge colloquy is triggered when there are not

packaged pleas.  That two spouses or family members are

negotiating pleas with the prosecutor simultaneously and enter

them on the same day does not make them "packaged", and no

further inquiry was needed at the Rule 11 hearings of Tutis and

Vega.[11]

    Moreover, as discussed above, Defendant Tutis has offered

no evidence for the proposition that, if the Court had asked him

the Hodge colloquy questions, his answers would have given pause

about voluntariness or coercion.  Farrell had prepared Tutis for

---

[10] The Hodge court indicated that the additional questions that may
be helpful to ask include: "[w]ho first proposed the package deal,
how extensively defense counsel was involved in developing the
deal, and what benefit the defendant expects to gain from the
deal." Hodge, supra, 412 F.3d at 492.  The court should also ask
not only "whether the prosecutor forced, threatened or coerced the
defendant, but whether anyone did so." Id.  These constitute the
contours of the Hodge colloquy that Tutis now argues was missing.

[11] Furthermore, as discussed above, even if the two agreements had
congruent forfeiture provisions for various jointly-owned assets,
that speaks to terms that are identical, not one plea being
conditioned upon the other.  The defense has not argued that a
Hodge colloquy is triggered merely by similar provisions in in co-
defendants' plea agreements, and no such authority exists.  In the
Tutis and Vega final plea agreements, if only one defendant had
pled guilty, that defendant's interest in the named properties
would be forfeited, not contingent on the other defendant's
decision or trial outcome.

a _Hodge_ colloquy and even Farrell's slippery testimony contained no speculation that Tutis would have given indications of involuntariness or coercion if asked. The idea of "package deal" had been initiated by the Government, but Tutis undoubtedly would have acknowledged that he had received no coercion from his wife or other family members and no threats from the prosecutors to add charges against Vega. He was represented throughout the negotiations by Farrell, who was a strong advocate and a buffer against any prosecutorial threats or coercion. Regarding the hypothetical answer Tutis would have given to the question of what benefit he hoped to gain, his answer again would be obvious – he gained, by pleading guilty, a cap on the sentence for which the Government could advocate, elimination of the threat of the penalty enhancement of 21 U.S.C. § 851, dismissal of most counts of the Second Superseding Indictment, preservation of certain appellate rights, points off the Guidelines Total Offense Conduct score due to accepting responsibility under U.S.S.G. § 3E1.1(a), and a compromise for forfeiture of fewer properties than the Government had charged and seized, among other benefits. Tutis has not even suggested that he was "taking the rap" for Vega, nor does he suggest that the Government has it wrong when it sees him as substantially more culpable than Vega.

43

In short, the Defendant's allegations that his Rule 11 hearing lacked or required <u>Hodge</u> colloquy for packaged pleas, or that he would have raised his involuntariness in truthful answers to a <u>Hodge</u> colloquy, are unavailing and fail to supply a plausible reason for withdrawal of his guilty plea.

**b.   <u>Lack of Understanding Unpackaged Plea</u>**

Defendant Tutis' alternative claim that his plea should be withdrawn because he did not understand that his plea was unpackaged from his wife's plea, and that he might not have chosen to enter an unpackaged plea, fares no better.  For such a ground to have any weight, Tutis would have to show not only that he was ignorant of the true status of his plea as unpackaged from Vega's by November 1st, but more importantly that an unpackaged plea would have been a substantial reason for changing his decision to plead guilty.  The issues are whether the evidence shows a reasonable probability that Tutis was unaware that his plea was unpackaged from Vega's, and second whether he would not have entered his plea of guilty standing alone, uncoupled from Vega's plea, and would have opted to go to trial.  First, as already discussed above, the Court does not believe Farrell's testimony that Farrell himself misunderstood the pleas to be packaged, in light of all the surrounding circumstances to the contrary and Farrell's improper motive to

buttress his former client's recent emerging claim of ignorance. Second, the November 1st statements of Tutis in his final written plea agreement (Ex. D-14), in the Rule 11 hearing (Ex. D-16), and in his Application for Permission to Enter Plea of Guilty (Ex. G-8), discussed at length above, repeatedly indicated that he had carefully read and reviewed his final plea agreement with counsel, that he understood and accepted it, and that it was the complete plea agreement. He specifically acknowledged he was not coerced to plead guilty to avoid consequences to someone else, stating: "I hereby declare that I have not been forced, coerced or threatened in any manner by any person to plead GUILTY to these charge(s). Nor have I been told that if I refuse to plead GUILTY, other persons will be prosecuted." (Tutis' Application for Permission to Enter Plea of Guilty, Ex. G-8 at ¶ 36.)

Tutis points to his statements from jail in the recorded conversation with Jazmin Vega on the evening of October 31st as suggesting that his mindset was to plead guilty only because it would help Vega. He would have this Court logically infer that if the pleas were not packaged, he would have rejected the Government's offer.[12] In fact, the Tutis/Vega conversation of

---

[12] Tutis had not yet seen the Government's revised plea agreement of October 31, 2016 (Ex. G-4), which made substantial concessions to Tutis' demands and eliminated the package plea language, because

October 31st makes only passing reference to Tutis' thought of pleading to benefit Vega. (See Ex. D-5.) After complaining to Vega that the Government was not acceding to his demands regarding forfeitures, exposure to prison time, and preserving the right to appeal, Tutis said, speaking of the stipulated trial that was under negotiation, "I'll take the stipulated joint, you know what I mean, just to get you out of it, you know what I mean, but I'm going, I'm going, man, I'm going...." (Ex. D-5 at 3:17-20.) And later Tutis said: "I'm going to end it for you tomorrow. I'll take a conditional joint. I mean, not conditional, I'll take the stipulated joint. The stipulated joint give me the right to challenge all my properties, you know what I mean? They going to 851 me, go ahead, 851 me," referring to the prospect of the enhanced penalty information if he went to trial. (Id. at 5:1-5.) Tutis' predominant, recurring interests, the ones which made him agitated to speak about, concerned his properties, his conditional appellate rights, and going to trial if he couldn't preserve some of the properties for his family's welfare. (Id. at 5:17 to 6:20; 7:1 to 8:25; 10:16-23.)

---

the Government did not send it to Farrell until 8:29 PM that night (Ex. D-13), as discussed above.

Later in the conversation, Vega was explaining to Tutis that he should not concern himself with her because she didn't want him to risk his rights for her benefit by fighting over the forfeiture of the properties ("VEGA: I don't want you to fuck freedom over some properties .... Honestly, that's how I feel. I want you to come home ... [inaudible] like that," (Ex. D-5 at 8:5-6, 14-16). Vega explained that AUSA Carrig was commenting to Mr. Archie, presumably about Tutis' rejection of the plea offer, that Carrig said "I didn't want it to go this way or whatever, she was like, ... she was saying something about I didn't want it to go this way or whatever the case may be. She was like trying to work something out for her or whatever," (id. at 9:16-21), meaning that AUSA Carrig indicated she was willing to work out a separate plea for Vega. This confirms testimony of Archie and Vega about that interaction with AUSA Carrig as the separate revised plea was being negotiated with Archie, as discussed above. It could not have been lost on Tutis, after hearing this from his wife, that Vega, on the evening of October 31st, was telling him to get the best deal he could for himself because her case was being worked out, and that she would be okay.

Bearing Vega's statement in mind, on November 1st Tutis, through Farrell, rejected the Government's offer again and

pressed the very points that Tutis had dwelled on with Vega, as discussed above. Knowing that Vega would be worked out, Farrell and Tutis continued to press for, and achieved, a significantly better deal for Tutis. Moreover, other factors were at play, pressing Tutis to make his best deal and plead guilty. Everyone has acknowledged the strength of the evidence Tutis would have confronted at trial consisting of many law enforcement officers, other eyewitnesses, and voluminous electronic surveillance directed at him and other conspirators. Second, the passage of time itself was pressing him and everyone for finality in the plea negotiations as the selected trial jury awaited. Third, he would not have to go to trial to preserve the right to appeal the pretrial suppression motion decisions that he believed were erroneous, if he could achieve a Rule 11(a)(2) conditional plea. Fourth, going to trial risked a considerably longer mandatory minimum sentence in the event of conviction due to the imminent filing of the § 851 penalty enhancement information, plus risking conviction on numerous other counts of the indictment, including weapons offenses. Unless Tutis was reasonably confident that the Government could not prove its case against him at trial, there would have been no reason to reject an uncoupled plea and go to trial. There is no indication in the

record that Farrell or Tutis thought they could achieve an acquittal at trial.

For these reasons, the Court finds, even if Tutis was unaware the pleas were unpackaged, that there is no prospect that he would have decided to reject the final renegotiated conditional plea and go to trial. This alternative theory does not amount to a substantial reason for withdrawing from the plea agreement.

### 3. Whether the Government Would be Prejudiced by the Withdrawal

Prejudice to the Government, the third factor for consideration, is a neutral value in this motion. On the one hand, the United States has indicated it would not be curtailed in trying the case if the Tutis plea was withdrawn. The Government pointed to no witnesses who would be unavailable due to death or infirmity. (Gov't Opp. Br. at 23-24 (Docket Item 448.)) AUSA Wiener retired, so a new AUSA would have to learn this complicated case (Tr. 6/26/17 at 203), but the Government said that if it could have sufficient time to prepare witnesses again, acclimate a new AUSA, and focus its trial exhibit list on Tutis, it would be ready.

On the other hand, there is a cost to the Government in the previous time expended by its AUSAs and case agents in preparing for trial, selecting a jury, and negotiating Tutis' plea

agreements, that would be lost, much of it as wasted time and effort of the prosecution that would have to be repeated by a partly new trial team. That period of intensive trial preparation through the entry of the November 1st plea was about one month.[13]

**B.  Summary of Analysis**

After careful consideration of the record, the Court has thus found that (1) the Defendant does not assert his innocence in any plausible way (see Part III.A.1, above); (2) the Defendant does not present a strong reason justifying the withdrawal of the plea (see Part III.A.2, above); and (3) the Government would not be especially prejudiced by withdrawal of the plea provided the prosecution team is given enough time to prepare a second time for a new trial (see Part III.A.3, above). In the absence of a plausible assertion of innocence and lack of a substantial reason justifying withdrawal, the absence of prejudice to the Government does not constitute a reason to grant this motion under Rule 11(d)(2)(B). Defendant has failed

---

[13] Although this prong concerns itself with prejudice to the Government, not to the Court, it is worth noting that the Court also invested parallel efforts in trial preparation, summoning a large panel of jurors, selecting jurors for two days, blocking out four weeks for this trial from its schedule, and convening the Tutis Rule 11 hearing. The Court cancelled the trial and excused the jurors in reliance upon Tutis' decision to plead guilty.

to "show a fair and just reason for requesting the withdrawal."
Rule 11(d)(2)(B), Fed. R. Crim. P.

**IV.** **CONCLUSION**

For the reasons stated above, the Court will deny Defendant
Tutis' motion for leave to withdraw his plea of guilty under
Rule 11(d)(2)(B), Fed. R. Crim. P.  The accompanying Order is
entered.


**November 13, 2018**                    **s/ Jerome B. Simandle**
Date                                         JEROME B. SIMANDLE
                                             U.S. District Judge