

U.S. Department of Justice

*United States Attorney*
*District of New Jersey*

| | | |
|---|---|---|
| RACHAEL A. HONIG<br>*United States Attorney*<br><br>DIANA VONDRA CARRIG<br>*Assistant United States Attorney* | CAMDEN FEDERAL BUILDING & U.S. COURTHOUSE     856/757-5026<br>*401 Market Street, 4th Floor*                                   Fax: 856/968-4917<br>*Post Office Box 2098*                              Direct Dial: 856/968-4927<br>*Camden NJ  08102* | |

March 26, 2021

**VIA ECF AND EMAIL**
The Honorable Renée Marie Bumb
United States District Judge
Mitchell H. Cohen Building
& U.S. Courthouse
4th & Cooper Streets
Camden, NJ 08101

                Re: *United States v. Toye Tutis,* Crim. No. 14-699-01 (RMB)

Dear Judge Bumb:

      The Government respectfully submits this letter brief in opposition to defendant Toye Tutis's *pro se* request for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and supplemental motion, dated June 19, 2020 and September 16, 2020.[1] ECF 662 & 698. The Government respectfully submits that the Court should deny Tutis's motion.

      While Tutis has at least one co-morbidity factor that places him at greater risk of severe illness should he contract COVID-19, namely severe obesity, the 18 U.S.C. § 3553(a) factors, specifically, the seriousness of his offense, his criminal history, and the need for him to serve a full sentence to protect the community and to deter him and others adequately, strongly weigh against such relief.

**I.     Background**

      On November 1, 2016, Tutis pleaded guilty before the Honorable Jerome B. Simandle to the following two counts of a 27 count indictment:  (1) Count 1 – running a large-scale drug trafficking operation from at least as early as February 2010 through his arrest on December 11, 2014, during which he conspired with numerous others to distribute and possess with intent to distribute more than 150 kilograms of cocaine and more than 26 kilograms of heroin, in violation of 21 U.S.C. § 846; and (2) Count 13 – conspiring with Jazmin Vega and others to launder millions of dollars in drug proceeds in furtherance of his drug trafficking organization, in

---

[1] On December 11, 2020, the Federal Public Defender's Office notified the Government and the Court that it would not be entering an appearance in this matter after reviewing Defendant's filing (ECF 726).

violation of 18 U.S.C. § 1956(h). After filing two unsuccessful motions to withdraw his guilty plea, Judge Simandle sentenced Tutis on May 6, 2019 to 264 months' imprisonment on Count 1 and 100 months' imprisonment on Count 13, to run concurrently. *See* Tutis's BOP Inmate Profile, attached as Exhibit A; *see also* ECF 584 (judgment of conviction).

## II.     The Bureau of Prisons' Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, the Bureau of Prisons ("BOP") has taken significant measures to protect the health of the inmates in its charge. BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), *available at* https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), *available at* https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id.* at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January 2020. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Nine of the Action Plan. *See* https://www.bop.gov/coronavirus/covid19_status.jsp. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step will limit transmissions of the disease.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for

release from isolation. In addition, facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped on March 13, 2020 to limit the number of people entering the facility and interacting with inmates. Social visits have since been reinstated where it is possible to maintain safety. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Legal visits will be permitted on a case-by-case basis, following preventative protocols.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: https://www.bop.gov/coronavirus/covid19_status.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of this filing, BOP has 7,481 inmates on home confinement and, during the period from March 26, 2020, has transferred a total of 23,280 inmates to home confinement (including inmates who have completed their sentence). *See* Federal Bureau of Prisons, COVID-19 Home Confinement Information, *available at* https://www.bop.gov/coronavirus/.

Taken together, these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

At FCI Gilmer, where Tutis is serving his sentence, these measures have been employed with success. As of this writing, FCI Gilmer currently has one positive inmate case (out of 1,508 inmates) and four positive staff cases. *See* COVID-19 Cases, BOP, *available at* https://www.bop.gov/coronavirus/index.jsp.[2]

In addition to the proactive safety measures the BOP has undertaken, outlined above, the United States has made great advancement in the development, authorization, and distribution of effective vaccines to combat the transmission of COVID-19. To date, three different vaccines have been approved for distribution, and distribution efforts are ongoing. On December 30, 2020, the BOP released the following statement regarding their efforts concerning the administration of vaccines:

> BOP advises that it is working with the Centers for Disease Control and Prevention (CDC) and a public-private partnership established by the federal government, known as Operation Warp Speed (OWS), to ensure the BOP receives the COVID-19 vaccine as it becomes available….At present, as vaccines are obtained, priority is given to full-time staff members, in order to mitigate the risk of staff members introducing the virus from the community. At each institution, any additional available vaccines are given to inmates, beginning with those deemed at high risk.

In addition, at least 97,108 vaccine doses have been distributed to the Bureau of Prisons nationwide, and at least 97,566 have been administered. *See* https://www.bop.gov/coronavirus/. According to the BOP's website, FCI Gilmer has begun vaccinations and as of this filing, 133 staff and 650 inmates (43% of the inmate population) have received vaccines. *Id.*

### III.   Tutis Has Exhausted His Administrative Remedies

Tutis appears to have exhausted his administrative remedies, as statutorily required. A court may grant a defendant's own motion for a reduction in his sentence *only* if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

BOP records show that Tutis submitted requests for compassionate release and home confinement, and that both of his requests were rejected. While Tutis does not appear to have appealed the BOP's decisions, more than 30 days have passed since BOP received Tutis's requests, so this Court may consider the merits of Tutis's motion for compassionate release and home confinement.

---

[2] According to BOP's website, "BOP has begun additional testing of asymptomatic inmates to assist in slowing transmissions within the correctional setting. As such, [BOP's] data reflects an increase in the number of COVID-19 positive tests[.]" *See* COVID-19 Cases, BOP, *available at* http://bop.gov/coronavirus.

**IV.     Tutis's Severe Obesity Is Considered an Extraordinary and Compelling Reason**

If the exhaustion requirement is met, the Court may reduce a defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]," if the Court finds, as relevant here, that:  (i) "extraordinary and compelling reasons warrant such a reduction"; and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i).

As the movant, Tutis bears the burden to establish that he is eligible for a sentence reduction.  *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014); *United States v. Epstein*, Crim. No. 14-287 (FLW), 2020 WL 1808616, at *2 (D.N.J. Apr. 9, 2020).

The relevant policy statement issued by the Sentencing Commission provides that a court may reduce the term of imprisonment after considering the Section 3553(a) factors if the Court finds that:  (1) "extraordinary and compelling reasons warrant the reduction"; (2) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)"; and (3) "the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13.

The policy statement includes an Application Note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons."  First, the standard is met if a defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." Application Note 1(A)(i) to U.S.S.G. § 1B1.13.  Second, the standard is met if the defendant is:

>   (I)     suffering from a serious physical or medical condition,
>
>   (II)    suffering from a serious functional or cognitive impairment, or
>
>   (III)   experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he is not expected to recover.

Application Note 1(A)(ii) to U.S.S.G. § 1B1.13.  The Application Note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances.  Application Note 1(B)-(C) to U.S.S.G. § 1B1.13.  Finally, the Note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons."  Application Note 1(D) to U.S.S.G. § 1B1.13.

Compassionate release is only available if, "after considering the factors set forth in [18 U.S.C.] § 3553(a) to the extent that they are applicable," the Court finds "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i).

The Centers for Disease Control and Prevention ("CDC") has classified individuals with obesity, Body Mass Index ("BMI") between 30 and 40, and severe obesity, BMI over 40, as being at increased risk of severe illness from COVID-19. *See* People with Certain Medical Conditions, CDC, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. Although Tutis does not state his BMI, based upon a review of his medical records, the Government believes that his BMI exceeds 40, making him severely obese.[3]

The Government, therefore, does not dispute that Tutis falls within a high risk category, as defined by the CDC and concedes that he presents an "extraordinary and compelling reason" that may allow a court to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A). Tutis's medical records show, however, that Tutis is capable of self-care and is and has been receiving adequate medical care while incarcerated.

## V.     The § 3553(a) Factors Strongly Weigh Against Tutis's Release

Despite Tutis's establishment of compelling and extraordinary circumstances, the Section 3553(a) factors strongly weigh against his motion, including: (1) the seriousness of Tutis's crimes; (2) his criminal history; (3) the need for his sentence to deter him and others from committing criminal offenses; (4) the need to protect the public; and (5) the need to avoid a sentencing disparity.

First, Tutis's crimes were serious. 18 U.S.C. §§ 3553(a)(1) and (a)(2)(A). He operated a large scale drug trafficking organization in southern New Jersey distributing kilograms of heroin and cocaine. Tutis was assisted in his distribution by his brother, Jewell Tutis, and his right-hand man Kareem Taylor, among others, and worked in conjunction with numerous other large scale drug traffickers. That Tutis was a major player in southern New Jersey is demonstrated not only by the volume of drugs he distributed (Tutis stipulated to distributing more than 150 but less than 450 kilograms of cocaine and 26 kilograms of heroin) but also that his primary source of supply was the Mexican Sinaloa cartel. During the course of the investigation, law enforcement officers intercepted shipments of both heroin and cocaine, including 10 kilograms of heroin which had been shipped by truck and 3 kilograms of cocaine which had been shipped via UPS.

Tutis unlawfully possessed three loaded firearms, a taser, and a bulletproof vest,[4] and—during lawfully intercepted wiretaps—bragged about being a "gunslinger" who surrounded himself with "soldiers." In response to Tutis's cartel connection's concern that the cartel was going to kill him for the loss of the 10 kilograms of heroin, Tutis responded that they should

---

[3] The Government has obtained Tutis's medical records from the BOP for 2016 through 2021, and will provide a copy to the Court upon request. Tutis alleges additional medical conditions in his motion which are supported by his medical records, including sleep apnea, bronchitis, being pre-diabetic, and also having a prior tuberculosis infection. *See* ECF 662 & 698. Tutis's medical records confirm that he is being treated for a latent tuberculosis infection. None of these medical conditions place Tutis in a high-risk CDC category. However, as explained above, his severe obesity does.

[4] *See* PSR at ¶ 67 (summarizing items seized from Tutis's residence and place of business).

strike first: "Let's, let's okay, let's go kill his wife then, let's go get his wife and his kids and whatever and let's get them first then?"

With respect to the money laundering, Tutis laundered the proceeds from his drug trafficking with the assistance of his paramour Jazmin Vega, his right hand man, Kareem Taylor, and others, through various means, including by shipping cash to the west coast to buy more drugs, depositing the cash into various bank accounts, purchasing real estate, cars, gift cards, money orders and other assets, buying in and cashing out at casinos in Atlantic City and comingling the drug trafficking proceeds with the proceeds from his other businesses. Tutis and Vega owned and/or operated numerous businesses, including Ta'Ja Construction, LLC, Ta'Ja Construction I, LLC, Ta'Ja Real Estate Investors, LLC, Ta'Ja Laundromat, LLC, Dave's Grocery, and Integrity Heating and Cooling, LLC. At the time of Tutis' arrest, Ta'Ja Real Estate Investors owned approximately 34 properties in southern New Jersey and in the Eastern District of Pennsylvania, all of which had been paid for or had expenses paid from funds from comingled business bank accounts.

Second, Tutis's history and characteristics also weigh against release. 18 U.S.C. § 3553(a)(1). He is a career offender and lifelong drug dealer with five felony drug convictions who appears utterly unrepentant for pumping poison into his community year after year. PSR ¶¶ 167-72. While presenting himself as a legitimate businessman and benefactor to the community, in reality, Tutis used his drug monies to build an empire of businesses and real estate holdings, which, in turn, he used to launder and hide his drug proceeds. Driven by greed and the desire for respect and admiration from those in the street life, Tutis continued selling drugs long after he apparently had any financial need to do so. All the while, he recruited his family and friends into his illegal activities, including his life-partner, his brothers, his childhood best friend, and even two of his paramours, whom he paid to accept shipments of cocaine.

Tutis's conduct throughout this criminal litigation has shown his true character. Among other things, he:

- asked his daughter to smuggle contraband to him at the FDC, *see* PSR ¶ 151 (3/15/2015 possession of a non-hazardous tool); *see also* Tutis's BOP Disciplinary Report, attached hereto as Exhibit B;
- repeatedly lied during proffer sessions, including by falsely presenting himself as an eye-witness to an open homicide when, in fact, he had purchased information about the homicide from another inmate;[5]
- reneged on the stipulations he agreed to in his plea agreement; and
- lied while testifying before Judge Simandle in support of his 28 U.S.C. § 2255 motion to withdraw his plea, *see* ECF 580 at 7-8 & 12 (Judge Simandle found that Tutis's testimony on April 4, 2019, "contained a litany of lies" and "is incredible.").

---

[5] This was not just a lie, but a multi-step scheme that Tutis put together to attempt to trick law enforcement into extending him a cooperating plea agreement. Specifically, Tutis: (1) engaged in conversations at the FDC looking for "good" information to give to the Government so that he would get a § 5K1.1 departure; (2) made a deal to pay for the information; (3) made arrangements with family members to send the payoff money; and (4) repeatedly lied (all the while knowing that it is a federal offense to lie to federal law enforcement officers pursuant to 18 U.S.C. § 1001), about the murder and all the details of how it happened and who was present.

Third, the need for deterrence weighs heavily against early release. 18 U.S.C. §§ 3553(a)(2)(B)-(C). Tutis is a proven lifelong criminal offender. A grant of early release would not and could not deter Tutis from returning to engaging in criminal conduct.

Fourth, Tutis's extensive and lengthy drug trafficking and possession of loaded firearms, especially when coupled with his disregard for basic morals and the law, make him a continuing danger to the community.

Finally, denying Tutis's motion would avoid sentencing disparities among similarly situated defendants. 18 U.S.C. § 3553(a)(6). Tutis's offenses of conviction carried a guidelines range of 360 months' to life imprisonment (although the Government agreed in the plea agreement not to seek a sentence of more than 330 months'). PSR ¶ 208. At the time of sentencing, Judge Simandle afforded Tutis the benefit of a variance, sentencing him to 264 months' imprisonment and five years of supervised release. According to the BOP, Tutis's good conduct release date is November 2, 2033, which means that he still has almost 11½ years to serve. For all of the reasons explained above, Tutis should not be relieved from serving the remainder of his sentence.

In sum, compassionate release would not promote the interests of sentencing, and Tutis's motion should be denied on these grounds.

## VI. The Court Cannot Direct the BOP to Place Tutis on Home Confinement

Finally, although not directly requested by Tutis in his present motion, even if this Court were to read Tutis's motion as a request to order BOP to place him on home confinement under the guidelines set forth in the Attorney General's March 26 and April 3, 2020 memoranda,[6] this Court should deny the request. District courts have no authority to direct BOP to place a defendant in home confinement. *United States v. Voda*, 994 F.2d 149, 151-52 (5th Cir. 1993). Rather, such designation decisions are committed solely to BOP's discretion. *See* 18 U.S.C. § 3621(b); *Moore v. United States Att'y Gen.*, 473 F.2d 1375, 1376 (5th Cir. 1973) (*per curiam*); *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise.").

Moreover, a prisoner has no constitutional right to confinement in any particular place, including in home confinement. *See Sandin v. Conner*, 515 U.S. 472, 478 (1995) ("the Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers."); *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons."). And Section 3582(c)(1)(A) permits only a reduction in "the term of imprisonment," not a change in the place of imprisonment. Home confinement merely permits the inmate to serve out the term of imprisonment at home. Such a request therefore falls outside § 3582(c)'s limited grant of authority to this Court to modify a sentence post-conviction. Absent any other

---

[6] Memoranda available at: https://www.bop.gov/coronavirus/faq.jsp.

statutory authority—and Tutis cites none—this Court has no authority to grant such relief in this forum.

**VII.** <u>**Conclusion**</u>

Accordingly, this Court should deny Tutis's motion for compassionate release.

Respectfully submitted,

RACHAEL A. HONIG
Acting United States Attorney

By: *Diana Vondra Carrig*

DIANA VONDRA CARRIG
Assistant U.S. Attorney

cc: Toye Tutis, Reg. No. 67059-050, FCI Gilmer, Federal Correctional Institution, P.O. Box 6000, Glenville, WV 26351